CSC HOLDINGS, INC., Plaintiff,

v.

WESTCHESTER TERRACE AT CRIS-
FIELD CONDOMINIUM; Westches-
ter Terrace at Crisfield Condominium
Association; Richard Neuman, as
President of Westchester Terrace at
Crisfield Condominium Association;
and Digitech TV Corp., Inc., Defen-
dants.

No. 01CIV8134CMGAY.

United States District Court,
S.D. New York.

Oct. 21, 2002.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Both sides in this case have moved for summary judgment. Most of the issues raised by the cross-motions are amenable to summary disposition. However, four claims remain, as well as one counterclaim. Thus, I cannot dispose of the case on motion.

### ESSENTIAL BACKGROUND INFORMATION

#### The Parties

Plaintiff is the operator of "Cablevision". It holds a franchise from, inter alia, the City of Yonkers in Westchester County, to operate a "cable television system." A cable television system is defined, at Public Service Law § 212(2), as:

> . . . . . any system which operates for hire the service of receiving and amplifying programs broadcast by one or more television or radio stations or any other programs originated by a cable television company or by any other party, and distributing such programs by wire, cable, microwave or other means, whether such means are owned or leased, to persons in one or more municipalities who subscribe to such service. Such definition does not include: (a) any system which serves fewer than fifty subscribers; or (b) any master antenna television system.

Westchester Terrace at Crisfield ("WT") is a three story, 60 unit condominium apartment building located in Yonkers, New York. Westchester Terrace at Crisfield Condominium Association ("WTA") is a voluntary association formed by WT's resident-owners and appointed as their agent to manage the common areas of the building. Richard Neuman is the President of WTA.

Defendant Digitech TV Corp., Inc., operates a satellite master antenna television (SMATV) service known as DirecTV. Unlike the traditional cable television system operated by plaintiff, which delivers video programming to a large community of subscribers though coaxial cables laid under city streets or along utility lines, DirecTV receives a signal from a satellite through a dish located on a rooftop, and then retransmits the signal by wire to units within a building or complex of buildings. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 311, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (defining SMATV system). New York Public Service Law § 212(5) defines a "master antenna television system" as:

> . . . any system which serves only the residents of one or more apartment dwellings under common ownership, control or management, unless such system uses facilities located in a public right of way to provide service.

As noted above, a master antenna television system is not a cable television system within the meaning of the Public Service Law; indeed, the law expressly states that the two are mutually exclusive ("cable television system . . . . does not include . . . any master antenna television system"). As a result, Digitech is not required to obtain a franchise from a municipality prior to installing its equipment at a condominium complex like Westchester Terrace.

#### The Agreement at Issue

In 1995, WT entered into an Access Agreement ("Agreement") with Cablevi-

sion Systems Corporation (now known as CSC Holdings), authorizing CSC to install and update a telecommunications system for the use of occupants of the 66 Crisfield Street building. For that purpose, the Agreement granted CSC "the *non-exclusive* right to provide telecommunications services to the Premises by placing, maintaining, affixing, and attaching cables, wires, equipment, molding and appurtenant devices (hereinafter 'Equipment') through, in or on the Premises." (Emphasis added) WT retained the right to approve plans for the installation, and CSC agreed to restore the premises following the installation. Per paragraph 2 of the Agreement, WT agreed to afford CSC reasonable access to the building from time to time for the purpose of installing, maintaining or removing the Equipment. Per Paragraph 8, the Equipment "shall remain the property of the Company, and nothing herein shall be deemed to create any property interest herein in" WT or anyone else. Paragraph 12 states, "[T]he parties each agree that this Agreement shall remain in full force and effect from the time the Premises is rewired and reactivated with the Company's signal until the termination of the Company's franchise with the City of Yonkers including any extensions or renewals thereof."

### The Equipment

Pursuant to the parties' Agreement, CSC installed the Equipment at 66 Crisfield and has provided cable service to the building continuously from that day to this using that Equipment.

There is a utility closet on each floor of the building. Inside each utility closet is a lock box, known by the name Multiple Dwelling Unit Box, or MDU. The MDU's were installed by CSC and are under CSC's control. The MDU is the distribution point, transferring the signal from the main cable running into the building to the individual coaxial cables, each of which serves an apartment. Each MDU has inside it many "taps," and the cables that serve each individual apartment are connected to one of the taps inside the locked Box. These wires emerge from that box to enter a metal conduit affixed to the wall inside the utility closet. That conduit runs a short distance into a cavity inside the sheetrock hallway ceiling. Once the cable wiring is inside the ceiling cavity, the metal conduit ends. The wire servicing an individual subscriber runs inside the ceiling cavity to a point where it penetrates the sheetrock demising wall between the hallway and the apartment it serves. There are 21 apartments on each floor of the building, so there are a total of 63 points where the wire penetrates the sheetrock demising wall between the hallway and each of the apartments in the building.

The MDU and all the wiring that runs out of it is "Equipment" within the meaning of the contract and is the property of plaintiff.

### Home Run Wiring vs. Home Wiring

The Federal Communications Commission (FCC) has established rules that govern the use and disposition of wiring inside multiple dwelling buildings such as WT. The FCC divides the wire that runs from the MDU into an individual apartment into two segments. The wire running from the MDU (which is where the cable becomes dedicated to an individual unit within the building) to a point known as the "demarcation point" is categorized as "home run wiring." 47 C.F.R. § 76.800(d). From the demarcation point to the back of the resident's television set, the wire is categorized as "home wiring." 47 C.F.R. § 76.76.5(II). A somewhat crude way of explaining the difference between home and home run wiring is that home run wiring is the cabling located in the com-

mon areas of the building, whereas home wiring is located primarily within the subscriber's apartment or in the common area immediately adjacent thereto.[1]

Under the rules, the demarcation point is presumptively located at a point that is twelve inches outside the point where the wire enters the apartment. 4 C.F.R. § 76.5(mm)(2). However, if that point is "physically inaccessible"—which means that obtaining access to the wiring at that point would require "significant" modification or damage to "existing structural elements" *and* would add "significantly" to the "physical difficulty or cost of accessing a subscriber's home wiring," 47 C.F.R. § 76.5(mm)(4)—then the demarcation point moves to "the closest point at which the wiring becomes physically accessible that does not require access to the subscriber's unit." 47 C.F.R. § 76.5(mm)(5); *see also* Report and Order and Second Further Notice of Proposed Rulemaking, CS Dkt. No. 92–260, MM Dkt. No. 92260, FCC No. 97–376 (Oct. 17, 1997), (hereinafter "FCC Report"), ¶ 150. The FCC has determined that "wiring embedded in brick, metal conduit or cinder blocks with limited or without access openings would likely be 'physically inaccessible,' wiring enclosed within hallway molding would not." *Id.*

The distinction between "home wiring" and "home run wiring" and the location of the demarcation point between the two is important. In 1996 and 97 the FCC issued a series of regulations (known as the Home Wiring Rules and the Home Run Wiring Rules) to govern the disposition and use of coaxial cable owned by a service provider (the incumbent service provider) that either has lost or is about to lose the

legal right to service customers in a multi-family building.

The "home wiring" rules (which are found at 47 CFR § 76.802(a)(2)) govern disposition of the "home wiring" when an individual customer within a multi-family building terminates its service with the incumbent provider in order to acquire service from a competitor. In such a case, before a cable operator can remove existing wiring it owns, the customer must be given an opportunity to purchase the "home wiring" from the incumbent (in this case, CSC) at "replacement cost," so that the competing vendors can access its premises without unduly impacting the condition of their homes. If the customer declines to purchase the home wiring, the incumbent service provider must remove it within seven days. The "home wiring" rules recognize the installer's ownership rights in the coaxial cables it installed and offer compensation whenever an individual consumer wishes to use those cables to obtain alternative service.

By their terms, the home wiring rules apply only when there is a "voluntary termination of cable service by an individual subscriber in a multiple-unit installation." FCC Report ¶¶ 122–123. Since residents of multiple-family dwellings ordinarily obtain and cancel their own cable service, a condominium association or coop board cannot ordinarily exercise the subscriber's right to terminate service; that right is reserved to the individual customer. Indeed, the FCC specifically declined to adopt a proposed rule that would have permitted building owners and condominium associations (like WTA) to act as tenants' agents in providing notice of intent to

---

**1.** Indeed, it is because the owner of a multiple dwelling building has control of the common areas (as WTA has control of the common areas at 66 Crisfield) that it has rights superi- or to individual unit residents under the "home run" wiring rules. FCC Report at ¶ 59. See text below for a fuller explanation.

change service providers for their individual units.  FCC Report at ¶ 50.

The "home run wiring" rules, 47 C.F.R. § 76.804, as the name suggests, govern the disposition of home run wiring when an incumbent provider is about to be ejected from a building.  There are two different types of home run wiring rules: rules that govern disposition of cabling on a building-wide basis ("Building-by Building Disposition") and separate rules that govern disposition of home run wires on an individual subscriber basis ("Unit–by–Unit Disposition").

Under the Building by Building rules, should the owner of the building (in this case, defendant WTA) wish to use the existing home run wiring to provide all the residents in the building with service from another provider, it must give the incumbent 90 days' notice that the incumbent's access to the building will be terminated. The incumbent must then elect to do one of the following: (1) remove its wiring and restore the building to its original condition (within a certain number of days); (2) abandon the wiring without disabling it at the end of the 90 day notice period; or (3) sell the wiring at a privately negotiated price, either to the building owner or to the alternative service provider.  47 CFR 76.804(a).

As an alternative to contracting with a new provider for the entire building, the building owner may permit a variety of service providers to compete for the right to serve individual units.  In that case, upon sixty days' written notice, the incumbent (which will no longer be servicing anyone in the building) may choose to (1) remove the wiring and restore the premises; (2) abandon the wiring without disabling it; or (3) sell it to the building's owner. This is the "Unit by Unit" approach.  47 CFR 76.804(b).

Under either scenario, if the parties are unable to agree on a price, the incumbent must either remove the wiring, abandon it, or submit the issue of price to binding arbitration.

Before EITHER the Building by Building or Unit by Unit Home Run Wiring rules can be invoked, the incumbent service provider must have lost, or be about to lose, its right to remain on the premises against the wishes of the building's owner (or the condominium association).  If the incumbent retains the right to service so much as one customer in the building, these rules simply do not apply.  The FCC Report makes this crystal clear at ¶ 69, which states:

As noted above, the procedural mechanisms we are adopting will apply only where the incumbent provider no longer has an enforceable legal right to maintain its home run wiring on the premises against the will of the MDU owner. These procedures will not apply where the incumbent provider has a contractual, statutory or common law right to maintain its home run wiring on the property.  We also reiterate that we are not preempting any rights the incumbent provider may have under state law. In the building-by-building context, the procedures will not apply where the incumbent provider has a legally enforceable right to maintain its home run wiring on the premises, even against the MDU owner's wishes, and to prevent any third party from using the wiring. In the unit-by-unit context, the procedures will not apply where the incumbent provider has a legally enforceable right to keep a particular home run wire dedicated to a particular unit (not including the wiring on the subscriber's side of the demarcation point) on the premises, even against the property owner's wishes.

Furthermore, only when the owner or the condominium association elects to dispose of the incumbent's entire stock of home run wiring under the Building by Building Disposition rules can an entity like WTA exercise home wiring rights on behalf of a building's residents. In such a case, 47 CFR § 76.804(a)(4) of the *home run wiring rules* permits the building owner or condominium association to acquire the home wiring on behalf of all of the building's residents. This permits an owner or condo association to end the incumbent's access to and service within the entire building via a single procedure. However, should the building owner (a) have the right to invoke the home run wiring rules and (b) choose the unit by unit method, then each individual subscriber must take care of its own home wiring under the home wiring rules. The FCC took care to state that it was not creating "any new right of MDU owners and alternative providers to act on behalf of subscribers in terminating service." FCC Report ¶ 50.

The procedures set forth in the home run wiring rules apply in every case where the rules are properly invoked unless and until the incumbent provider obtains a court ruling or an injunction "enjoining its displacement" within forty-five days following the initial notice "of eviction." 47 CFR § 76.804(c). Thus, if an incumbent believes that the building owner has no right to force it to leave the premises, it has ample time, following invocation of the rules, to obtain a court order adjudicating its right to continue providing service on the premises. That the only type of injunction contemplated by the rules is an injunction against the "displacement" (i.e., eviction) of the incumbent provider from the premises is evident from the FCC Report, which states, "an incumbent's failure to obtain a state court injunction justifies a presumption that the incumbent no

longer has an enforceable legal right to remain on the premises." FCC Report at ¶ 77.

Both the "home run" and the "home" wiring rules balance the economic rights of the cable companies with the consumer's right to the benefits of free an open competition for telecommunications services.

### Laws Relevant to Cable TV Franchise Operation in New York State

To operate a cable television franchise within a municipality in New York State, a cable system must have a franchise granted by that municipality and approved by the Public Service Commission (PSC). Pub. Serv. Law (PSL) §§ 215(d)(5), 219(1), 221(1). An application to renew a franchise must be directed in the first instance to the municipality, which holds hearings and makes a public determination whether to grant the renewal. 9 NYCRR § 591.3(c)(1). The PSC must also approve any renewal. PSL § 221(1). To prevent a municipality from unfairly denying renewal of a franchise for political reasons, Congress requires local franchising authorities to consider certain issues on a prescribed timetable and limits the reasons why a franchise cannot be renewed. 47 U.S.C. § 546(c)(1) and (3). However, "A franchise shall terminate at the expiration of its term or otherwise in accordance with the provisions thereof, unless, prior thereto, the commission otherwise orders." PSL § 227(1). The same section of the PSL provides that the PSC may enter such an order (i.e., an order that a franchise shall not terminate at the expiration of its term or otherwise in accordance with its provisions) only if it makes certain types of findings after notice and a public hearing. No such hearing has ever been held with respect to CSC's operation in Yonkers and no such findings were ever

made by the PSC relative to this particular franchise.

However, PSL § 216(1) empowers the PSC to issue and amend such orders as it finds necessary or appropriate to carry out the purposes behind the State's laws regulating cable television companies. The PSC has long followed the practice of issuing temporary orders of authority (TOA) in instances when a cable company's municipal franchise was about to expire but the local authority had not timely acted on the franchise renewal application. Each TOA indicates that the PSC "has determined that it would be in the public interest to grant Temporary Operating Authority so that the [operator] may continue to provide cable television services during the franchise renewal." (Ex. D to Plaintiff's Rule 56.1 Statement.) The TOAs require the cables operators to continue paying franchise fees to the municipal government and address issues of insurance indemnification and maintenance. According to Chad Hume, Deputy Director for Cable, Office of Communications at the PSC, the PSC issues hundreds of TOAs annually to cable system operators, and has done so for the past 20 years. Fully 80% of all existing franchises in the State of New York require one or more TOAs to continue in operation. DPS maintains a practice of monitoring franchise expiration dates and issuing TOAs to ensure that franchises do not lapse. This procedure has been followed for over twenty years, and has never been the subject of any legal challenge. (Hume Aff. ¶¶ 3–7)

Public Service Law § 228, New York's "cable access statute," provides in pertinent part as follows:

> No landlord shall (a) interfere with the installation of cable television facilities upon his property or premises, except that a landlord may require: (1) that the installation of cable television facilities conform to such reasonable conditions as are necessary to protect the safety, functioning and appearance of the premises, and the convenience and well being of the other tenants; . . . . . . . .

By its terms this law addresses one thing only: the installation of cable television facilities. It limits landlords (like WTA) from preventing a cable operator from coming into a dwelling in New York State, but permits the landlord to have reasonable requirements to prevent disruptions to the premises resulting from installation.

### CSC's Yonkers Franchise: Current Status

The Franchise Agreement between CSC and the City of Yonkers was due to expire by its terms in December 1996. Since that time, CSC has provided cable television service to Yonkers residents pursuant to a series of TOAs issued by the PSC. These TOAs extend CSC's operating authority for six additional months on the terms and conditions that were in effect prior to December 1996. The City of Yonkers has taken no affirmative steps to prevent the PSC from issuing these TOAs, or to prevent CSC from sending its cable signals into Yonkers. Indeed, Yonkers has willingly accepted millions of dollars in franchise fees from CSC throughout the five and a half year period while CSC has been operating pursuant to TOAs. Similarly, the PSC has not threatened to stop issuing TOAs in order to goad Yonkers into taking action on CSC's renewal application. Doing business pursuant to TOA has become the modus operandi for CSC in Yonkers—as it is elsewhere in the State. (Affidavit of Chad G. Hume, Deputy Director for Cable, Office of Communications, New York State Department of Public Service)

### THE DISPUTE THAT GIVES RISE TO THIS ACTION

#### Direct TV Comes to 66 Crisfield

On or about April 23, 2001, WTA, by counsel, advised CSC that Digitech, a sat-

ellite television service provider affiliated with DirectTV would be providing video programming to WT residents. In the same letter, counsel for WTA further advised CSC that Digitech planned to use CSC's Equipment—specifically identified as its "home run wiring"—to provide service to residents of WT. The letter served notice "that the Association hereby invokes the procedures set forth in 47 C.F.R. § 76.804(b) for the 'unit by unit' disposition of home run wiring in the Property."

The defect in this letter is obvious. The letter nowhere asserts that CSC has lost, or is about to lose, its right to provide cable service to WT residents. Indeed, the letter specifically states that Digitech will only be using the home run wiring (which it refers to as "cable drops," a term that nowhere appears in the FCC's rules) "that are not actually in use to serve any of your customers." Thus, the letter concedes that CSC had a legally enforceable right to continue servicing WT residents. That being the case, the home run wiring rules had no applicability, and their invocation was a nullity.

Nonetheless, CSC had only a non-exclusive license to provide telecommunications services at 66 Crisfield. It was, therefore, in no position to object to Digitech's arrival as a competitor on the premises. And it did not do so. However, CSC strongly objected to Digitech's proposed use of CSC's Equipment (which CSC continued to own, per the Agreement) to carry its signal from the satellite to the apartments of its new subscribers. In other words, CSC objected to co-location.

By letter dated May 22, 2001, CSC protested that the "home run wiring rules" invoked by WTA did not apply to CSC, for the obvious reason that it still had the right to provide service in the building, under the Access Agreement and under New York State Law (specifically, Public Service Law § 228, the so-called New York Access Law).

WTA responded by letter dated May 25, 2001. Rather than addressing CSC's argument that it had a contractual right to remain on the premises (and thus conceding the point *sub silentio*), WTA asserted that the wires Digitech would be using were actually "home wiring" rather than "home run wiring." This made WTA's invocation of the FCC's Rules even more mysterious, since—as explained above—the home wiring rules can be invoked by a party other than an individual subscriber ONLY when the building owner chooses to invoke the Building–by–Building home run wiring rules. Even in its first letter, WTA had not purported to invoke the Building-by Building Disposition rules. Equally mysterious (to this Court, at least) was defendants' assertion that it would not waive the 45 day period for CSC to obtain an injunction against its displacement in the building. Since it was clear from the April 23 letter that WTA did not seek to displace CSC from the building, there was no need for CSC to obtain any injunction against such displacement. What WTA wanted Digitech to be able to do was to use CSC's existing wiring to service customers who wished to convert from Cablevision to DirecTV. But the FCC's rules do not provide for such co-location as long as CSC had the right to remain on premises at WT.

In the same letter, WTA indicated its belief that "Since the wires are installed inside a sheet rock soffit, the demarcation point appears to be located in the central utility room"—i.e., not twelve inches from each subscriber's apartment, but rather in the same closet where the MDU was located. CSC responded on June 20, 2001, reasserting its constitutional argument and contending that PSL § 228 (the only relevant provision that speaks to co-location)

affords a competitor (i.e., Digitech) access to CSC's home run wiring only when it could not install its own wiring in a manner that would protect "the safety, functioning and appearance of the premises, and the convenience and well-being" of its tenants. CSC protested that WTA had not even explored other wiring possibilities to see whether Digitech could install its wiring without impairing the premises or interfering with the tenants.

Nonetheless, Digitech, with the approval of WT and WTA, proceeded to install its facilities at WT, beginning in late June or early July of 2001. According to its President, Digitech put its satellite dish on the building's roof, then ran its cabling into its own separate lockbox (equivalent to the CSC's MDU) located in the same utility closet. It then ran cable wires a short distance into the same ceiling cavity where CSC's wires were located. Within that cavity, beginning at a point right outside the utility closet on the first and second floors, Digitech cut into CSC's previously installed wires and installed onto each wire a device referred to as a "displexer" (Digitech's term) or a "combiner" (CSC's term). On the third floor, Digitech found that CSC's wires had been spliced previously and reattached with something called a "barrel connector;" Digitech replaced the barrel connector with a displexer/combiner.

In each instance, Digitech obtained access to CSC's wire by unscrewing a fluorescent light fixture in the hallway near the utility closet. Digitech replaced the light fixture when it was through inserting the device on CSC's wires.

At no time did WT suggest that CSC would no longer be allowed to provide service to the residents of WT who desired to subscribe to Cablevision. Thus, at no time did CSC go to court to obtain an injunction against its "displacement" from the premises pursuant to 47 C.F.R. § 76.804(c).

### The Instant Action

On or about August 20, 2001—well after Digitech co-located its equipment—CSC filed a complaint for an injunction against the use of its wiring in the Supreme Court for the State of New York, Westchester County. The complaint sounded in conversion, breach of contract and interference with contractual relations, violation of PSL 228 (for allegedly restricting CSC's access to the premises) and violation of 47 U.S.C. § 553, which provides:

> (a)(1) No person shall intercept or receive or assist in intercepting or receiving any communication service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

Although asking for, *inter alia*, a declaration that defendants had converted its property, CSC sought no damages, only equitable relief—including an order reimbursing it for the cost of returning its property to its original condition.

CSC applied for a temporary restraining order to prevent Digitech from using its wires to provide service to residents of WT. CSC did not seek to prevent Digitech from serving the building, as long as it installed its own equipment. CSC also sought to enforce its right to reasonable access to the premises as guaranteed by the Agreement. The TRO was entered by Justice Bellantoni on August 24, 2001.

■ On or about August 29, 2001, defendants removed the case to this Court, on the ground that one of plaintiff's claims arose under Federal law.[2]

---

2. In their notice of removal, defendants also asserted that they had defenses to plaintiff's

On or about September 17, 2001, defendants filed an answer that admitted a number of key allegations—notably, that Digitech had spliced into the wires originally installed by CSC—but denied any liability. Defendants asserted that CSC had abandoned its ownership in its home run wires by neither making the election required by its invocation of the home run wiring rules nor obtaining an injunction against its displacement. Defendants also asserted that the wiring used by Digitech was really home wiring, not home run wiring, because the demarcation point was in fact in the utility closets, not at any point closer to the various apartments. Defendants sought various forms of declaratory and injunctive relief, as well as damages for violation of its civil rights pursuant to 42 U.S.C. § 1983—even though CSC is a private enterprise, not an arm of the State.

During the pendency of this action, the Court was asked to intervene in an ongoing dispute concerning CSC's access to the wires Digitech had installed. CSC contended that the Digitech co-location had resulted in signal leaks that were interfering with CSC's service to its many continuing customers in the building. On December 12, 2001, I ordered that the condominium allow Cablevision to enter the premises on the terms and conditions of the Order of the Supreme Court, dated August 24, 2001, to which defense counsel consented. Pursuant to that Order, Cablevision may enter the premises to perform testing and fix signal leakage.

The parties have engaged in discovery and fruitless settlement negotiations since last fall. Both sides have moved for summary judgment. Defendants seeks dismissal of the complaint and a declaration that WTA, not CSC, owns what it describes as the "coaxial cable 'drops' installed by Plaintiff ... inside the premises located at 66 Crisfield Terrace, Yonkers, New York." Plaintiff cross-moves for summary judgment on its claims for conversion, breach of contract, intentional interference, and violation of the Federal Communications Act. It prays for the entry of a permanent injunction as requested in those causes of action.

## SUMMARY OF DISPOSITION

CSC is entitled to summary judgment declaring that it owns the wiring it installed under the Access Agreement; dismissing defendants' affirmative defense that CSC abandoned its ownership of that wiring, by neither making the election required under the home run wiring rules nor obtaining an injunction against displacement; and dismissing any defense under the home wiring rules. CSC is entitled to summary judgment on its First Cause of Action for conversion, Second Cause of Action for breach of contract, and Fifth Cause of Action for intentional interference with contract. Plaintiff is also entitled to summary judgment on Defendants' First, Second and Third Counterclaims, seeking various declarations under the home and home run wiring rules; the Fifth Counterclaim, seeking access to CSC's Equipment; the Sixth Counterclaim, alleging that CSC breached Public Service Law § 228; and its Seventh Counterclaim, alleged pursuant to 42 U.S.C.

---

state law claims arising under the home and home run wiring rules. Of course, having a federal defense to a state law claim does not confer Federal jurisdiction. *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (citing *Taylor v.*

*Anderson,* 234 U.S. 74, 75–76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914)). Therefore, the only basis for jurisdiction in this Court is plaintiff's claim that defendants have violated 47 U.S.C. § 533 by using the wiring that Cablevision installed.

§ 1983. CSC's Third Cause of Action for breach of contract, Fourth Cause of Action for breach of Public Service Law § 228, Sixth Cause of Action for intentional interference with contract, Seventh and Eighth Causes of Action for unauthorized reception of cable service, pursuant to 47 U.S.C. § 533, and defendants' Fifth Counterclaim for breach of contract remain to be tried.

## DISCUSSION

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the govern-

ing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## MATTERS AS TO WHICH THERE IS NO GENUINE ISSUE OF MATERIAL FACT

1. *CSC's Franchise for the Building Has Not Been Terminated.*

Whether or not CSC still has a franchise at 66 Crisfield Terrace is important because it impacts the validity of defendants' purported exercise of certain building-wide rights under the home run or home wiring rules, as well as their argument that CSC, by not obtaining an injunction pursuant to 47 C.F.R. § 76.804(c) within 45 days after WT's invocation of the home run wiring rules, abandoned its ownership of the wiring between the demarcation point (wherever that may be) and the Lock Box. While the parties fence over complicated questions of entitlement, their arguments are largely irrelevant. Under the clear terms of the Access Agreement, CSC is entitled to operate in the building. Indeed, WT has never seriously contended otherwise.

The terms of the Access Agreement are not at all ambiguous, and this court can therefore interpret them as a matter of law. *See, e.g., Omni Quartz Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir.2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."). The Access Agreement expressly grants CSC the right to be on the premises as long as its franchise with the City of Yonkers has not been terminated, "including any extensions or renewals thereof." (Access Agreement, Cplt. Ex. A, ¶ 12.) That franchise has not been terminated. It has been extended semiannually since Decem-

ber 1996, pursuant to Temporary Operating Authority certificates granted to CSC by the New York State Public Service Commission.("PSC").

Defendants appear to argue that the Agreement expired in December 1996 because CSC's original Yonkers franchise expired at that time and was not lawfully renewed—i.e., it was not renewed by the City of Yonkers, or lawfully extended by the PSC. The argument is interesting but has no merit.

Defendants rest their argument on the indisputable fact that the PSC has not extended CSC's franchise pursuant to its authority under PSL § 227. That provision of the Cable Television Companies Act permits the PSC to forestall termination of a franchise, but only when the Commission makes findings, after a hearing, of a nature that could not be made in CSC's case. However, the PSC has issued TOAs to CSC to permit it to continue its operations since December 1996, when the original franchise was due to terminate. The PSC has issued hundreds of similar TOAs to continue cable franchises pending municipal renewal for over two decades, pursuant to its general powers as set forth in PSL § 216. It seems clear from Mr. Hume's affidavit that the TOAs are issued because the Commission's workload exceeds its ability to handle renewal applications in timely fashion. The Commission issues hundreds of these orders each year. CSC has operated in Yonkers pursuant to such orders for almost six years, without complaint from any party.[3]

Moreover, the PSC, which issues the TOAs, falls squarely within the definition of the terms "franchising authority" as used by the FCC. Under federal law, "franchising authority" includes "any governmental entity empowered by Federal,

State or local law to grant a franchise...." 47 U.S.C. § 521(10). The PSC is indisputably a governmental entity, and it is empowered by State law to approve all franchises and to extend existing franchises. Extension of a franchise is tantamount to granting a franchise within the meaning of the FCC's rules. As long as the Commission continues to issue it TOAs, CSC has a franchise to operate at 66 Crisfield, and a valid and binding Agreement with WTA.

### 2. WTA Had No Right to Invoke the Home Wiring or the Home Run Wiring Rules

From the above discussion, it should be clear that WTA had no right to invoke the home run wiring rules, as it purported to do in this case. Those rules apply only when a cable service provider will no longer be permitted to service any customers in a building. But CSC has a legally enforceable right to service Cablevision customers who live at 66 Crisfield. Indeed, WTA's original letter to plaintiff explicitly acknowledges that CSC *will* continue providing cable service to residents of Westchester Terrace who wish to use Cablevision:

> Please be advised that Digitech TV will use the Home Run Wiring for the provision of its service at the Property. This request is limited to the cable drops that run from your junction boxes or pedestals to the Demarcation Point (as that term is defined in 47 C.F.R. § 76.5(mm)) and further limited to cable drops *that are not actually in use to serve any of your customers.*

(Mac Naughton letter dated Apr. 23, 2001, Exh. B to Def.'s Answer) (Emphasis added). Thus, the home run wiring rules are

---

**3.** The proper forum for making such a complaint is in the New York State Supreme Court, via a petition under Article 78, brought against the PSC.

by their terms inapplicable to the situation at 66 Crisfield.

To the extent that WTA purports to rely on the home wiring rules to support its claim of abandonment by CSC, WTA could not invoke those rules on behalf of the building's residents as long as CSC had the right to service the building. The home wiring rules, as noted above, apply only to an individual service terminations, and can only be invoked by an entity like WTA when the provider loses its legally enforceable right to serve all customers within the complex. Defendants did not, at any time prior to this litigation, assert that CSC had no right to service any customers on the premises. In the context of this lawsuit, defendants assert that numerous CSC customers have terminated their service with Cablevision by moving from the building. But they offer no evidence to support this contention. Finally, defendants offer no evidence that new condominium owners who move into the building are barred from entering into service agreements with CSC using the home wiring previously installed. Indeed, under the Agreement, WTA cannot prevent tenants from subscribing to Cablevision as long as the City of Yonkers permits Cablevision to operate. So the home wiring rules, like the home run wiring rules, are irrelevant.

Because I rule on this narrow ground, there is no need for me to reach the convoluted (albeit interesting) question of whether CSC has effected, or has the right to effect, a "taking" of the space occupied by its wiring, in order to remain in the building under Public Service Law § 228, the "cable access statute." This issue, and the interplay of constitutional and state law questions it raises, ought not be reached in what is essentially dictum.

3. *CSC Owns the Wiring it Installed at Westchester Terrace and Did Not Abandon Ownership of that Wiring*

■ That CSC originally owned the wiring it installed at 66 Crisfield is beyond peradventure. The Agreement between CSC and WTA so states. End of discussion.

The question, then, is whether CSC has somehow abandoned its ownership. The answer is no.

Because defendants' purported invocation of the home run wiring rules was a nullity, there was thus no need for CSC to obtain an injunction within 45 days to prevent those rules from coming into play, as provided in 47 C.F.R. § 76.804(c). While it might have been the better part of valor for CSC to go to court and obtain an injunction on the ground that the home run wiring rules did not apply to its situation, no such injunction could have issued under § 76.804. That provision authorizes a court to issue an injunction against a provider's displacement from the building; it says nothing about co-location of facilities on an existing provider's wires. Defendants did not purport to displace CSC from the building, so the 45 day "statute of limitations" contained in the home run wiring rules never came into play.

For the same reason, the fact that CSC did not make one of three elections pursuant to the home run wiring rules within thirty days after they were wrongfully "invoked" did not constitute an abandonment. As a matter of logic, failure to make an election within 30 days cannot be deemed an abandonment, since a cable provider has fifteen additional days to obtain an anti-displacement injunction.

Moreover, assuming *arguendo* that the 45 day limitations period did come into play on April 23, it ceased to be relevant 32 days later, when defendants themselves

abandoned reliance on the home run wiring rules. On May 25, 2001, defendants advised CSC that the wires they intended to use constituted home wiring, not home run wiring, within the meaning of the FCC's regulations. So even if CSC had been obligated to go to court within 45 days upon receipt of the April 23, 2001 letter invoking the home run wiring rules, WTA's May 25,2001 letter withdrawing reliance on those rules effectively terminated that obligation. And since there is no similar "short statute of limitations" under the home wiring rules, CSC had no obligation to obtain an injunction within any particular time period once they were invoked.

4. *DirecTV is not a Cable Television System and Digitech is not a Franchised Cable Provider*

■ A company cannot operate a "cable television system" unless it has a municipal franchise, as CSC does. PSL § 219(1). Digitech has no such franchise. Therefore, it cannot, consistent with New York law, operate a cable television system.

Digitech admits as much. It even admits that it is an SMATV provider. Digitech does refer to itself as a "private cable system" in its supplemental memorandum of law. No statute, rule or regulation of which the Court is aware uses such a term. Cable television systems and master antenna systems are different types of systems under the law, so the fact that a video provider operates the latter does not make it an operator of the former.

5. *In Spite of their Knowledge of the Access Agreement, WTA and Digitech Acted Jointly to Use CSC's Wiring Without its Consent*

The Equipment was paid for and installed by CSC, and is owned by CSC under the Access Agreement. There is no factual dispute that Digitech used CSC's wiring to serve its own customers, even after CSC expressed its opposition, pursuant to the Access Agreement. Digitech knew of the Access Agreement and acted jointly with the WTA in spite of that agreement.

## WHAT FOLLOWS FROM THESE UNDISPUTED FACTS

*1. CSC is entitled to summary judgment dismissing Defendants' Second Affirmative Defense.*

Defendants contend that CSC no longer owns the wiring it installed back in 1995. But CSC does own that wiring. The Agreement gives CSC clear ownership of that wiring. The Agreement remains in full force and effect.

CSC has not abandoned its ownership of the wiring. To the extent Defendants rely on either the home or the home run wiring rules to support their claim of abandonment, they are in error as a matter of law, because those rules have no applicability to the situation at Westchester Terrace.

*2. CSC is entitled to summary judgment dismissing the First Four Counterclaims.*

Plaintiff is entitled to summary judgment dismissing the First, Second and Third Counterclaims, which seek various declarations under the home run and home wiring rules, including a fixing of the demarcation point. Although neither party has so moved, Plaintiff is also entitled as a matter of law to summary judgment dismissing the Fourth Counterclaim, in which . Digitech relies on the home run wiring rules to demand access to CSC's Equipment.

*3. CSC is entitled to summary judgment on its First Cause of Action for conversion.*

■ Interference with another's right to possession is the essence of conversion.

*Parkway Mgt. Co. v. Wolfson,* 32 A.D.2d 306, 308, 301 N.Y.S.2d 302, 303 (N.Y.A.D. 1969). Actual physical possession of the property is not necessary in order to constitute conversion:

> Any wrongful exercise of dominion by one other than the owner is a conversion . . . [A] wrongful intention to possess the property of another [is not] an essential element of a conversion. It is sufficient if the owner has been deprived of his property by the defendant's unauthorized act in assuming dominion and control. . . . No manual taking of the property or application of it to the defendant's own use is required. The exercise of dominion over property to the exclusion of and in defiance of the owner's right is a conversion.

*Glass v. Wiener,* 104 A.D.2d 967, 968, 480 N.Y.S.2d 760, 761 (2d Dep't 1984) (citations omitted); *Ahles v. Aztec Enters., Inc.,* 120 A.D.2d 903, 502 N.Y.S.2d 821 (2d Dep't 1986); *Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496 (4th Dep't 1981).

Defendants had no right to appropriate CSC's wiring for Digitech's use after the company had expressed its opposition. As noted above, the FCC rules do not apply to the facts of this situation.

■ Defendants contend that WTA had the right to authorize Digitech to use CSC's wiring pursuant to PSL § 228, New York's "cable access statute." The section of the statute on which Digitech relies is § 228(1), which provides in pertinent part:

> 1. No land lord shall (a) interfere with the installation of cable television facilities upon his property or premises, except that a landlord may require: (1) that the installation of cable television

facilities conform to such reasonable conditions as are necessary to protect the safety, functioning and appearance of the premises, and the conveniences and well being of other tenants; . . .

Pared to its essence, defendants assert that WT could compel co-location—Digitech's use of CSC existing wiring, apparently without any compensation to CSC—in order to prevent tenant disruption and to preserve the appearance of the building.

The first answer to defendants' argument is that § 228(1) of the Public Service Law has no applicability to Digitech's operation. That section applies only to duly franchised cable system operators and the installation of their equipment. As noted above, Digitech is not a duly franchised cable operator. PSL § 213(1) provides: "[T]he provisions of this article shall apply to every cable television system and every cable television company which constructs, operates and maintains a cable television system in whole or in part through the facilities of a person *franchised* to offer a common or contract carrier service." (Emphasis added). Thus, by its express terms the law invoked by defendants does not apply to the operations of DirecTV, which is a master antenna television system, not a cable television system. Since both "master antenna television system" and "cable television system" are defined in the statute, the Legislature was obviously aware of both types of video system. Yet it elected to make New York's cable access statute applicable only to franchised cable systems and their associated facilities.[4]

---

4. Defendants themselves acknowledge that § 228's applicability to Digitech's operations is questionable; in their counterclaims based on that statute. They plead only, "If and to the extent PSL § 228 is applicable to Digitech . . . . . . . . . . . . . . ." and do not affirmatively contend that the law applies to Digitech.

Defendants suggest two reasons why this conclusion is wrong. Neither is persuasive.

First, defendants urge that I am misreading § 228(1), and that its "unadorned language" encompasses SMATV providers as well as cable system operators. It is defendants, however, who are "adorning" the language of the statute. They would shoehorn Digitech, an SMATV provider, into the provision by arguing that § 228(1) governs the installation of "cable television facilities," (an undefined term in the Public Service Law), not the activities of operators of "cable television systems" (a term defined in § 212(2)). Digitech—which, as noted above, refers to DirecTV as a "private cable system"—suggests that its equipment qualifies as "cable television facilities". Unfortunately for Digitech, within the strictures of § 228(1), "cable television facilities" can only be installed by a "cable television company," (see § 228(1)(a)(2) and (3)). And Public Service Law § 213(1) makes it clear that a "cable television company" is one that "constructs, operates and maintains a cable television system..." No semantic gymnastics can transform Digitech, an SMATV provider, into a company that installs "cable television facilities" as that term is used in § 228(1).

Second, defendants contend that, if § 228(1) applies only to cable television operators, and not to SMATV providers, it has been preempted by a directive of the Federal Communications Commission—*In re Earth Satellite Communications, Inc.,* 95 FCC 2d 1223 (1983), *aff'd sub nom., New York State Commission on Cable Television v. FCC,* 749 F.2d 804 (D.C.Cir. 1984) ("ESCOM"). Plaintiff's counsel has made this argument before, on behalf of a different client, with respect to Connecticut's cable access statute, which is in all material respects identical to § 228(1). It was squarely rejected by the United States Court of Appeals in *AMSAT Cable v. Cablevision of Connecticut,* 6 F.3d 867, 876 (2d Cir.1993). In *AMSAT,* the FCC filed an amicus brief in which it specifically disclaimed any intention to preempt local cable access laws as long as they provided SMATV operators with an opportunity to compete with franchised cable operators and did not interfere with interstate and federally controlled communications systems. *Id.* New York's cable access statute expressly provides SMATV operators with the opportunity to compete with franchised cable companies like CSC. The relevant provision is § 228(3) (cited by neither party), which provides:

> No cable television company may enter into any agreement with the owners, lessees or persons controlling or managing buildings served by a cable television company, or do or permit any act, that would have the effect, directly or indirectly of diminishing or interfering with existing rights of any tenant or other occupant of such building to use or avail himself of master or individual antenna equipment.[5]

---

5. Defendants do not assert that CSC is in violation of § 228(3), and there is no indication of any such violation in the record. CSC has not entered into any agreement with WTA that has the effect of diminishing or interfering with the right of WT tenants to obtain DirecTV. Its agreement with WTA is non-exclusive and does not prohibit Digitech from installing master antenna equipment at 66 Crisfield. Additionally, CSC has not done anything to prevent any resident of 66 Crisfield from availing itself of DirecTV, or to prevent Digitech from installing master antenna equipment at 66 Crisfield. CSC has merely asserted its indisputable right as the owner of the Equipment it installed—equipment that Digitech has no right to use for free. Digitech remains perfectly free to run its own wires into the apartments of owner-

In view of this statutory acknowledgment of SMATV providers' right to compete, defendants' preemption argument is a red herring after *AMSAT*.

What defendants really assert (though never in so many words) is that § 228(1) somehow prevents CSC from interfering with their use of CSC's Equipment to provide video services to residents of WT. Even if the law could be read to cover the installation of Digitech's service—which it cannot—this would be errant nonsense.

First, as CSC points out, § 228(1), the section invoked by Digitech, imposes no duty of non-interference on CSC. Rather it regulates the conduct of *landlords* (like WTA).

Second, § 228(1) regulates the conduct of landlords in a particular way. They are prohibited from interfering with the installation of cable television equipment. There is no allegation here that WTA has interfered with the installation of any cable television equipment. Neither is there any suggestion in the record that WTA has interfered with the installation of equipment by Digitech (which, of course, is not cable television equipment). On the contrary, WT wants DirecTV in the building and has cooperated with Digitech in every way, even to the point of subjecting itself to liability to CSC in this lawsuit.

Third, § 228(1) does not give a video programming provider any rights with respect to equipment belonging to its competitors. Nor could the Legislature have done that, without raising a constitutional hornets' nest. It simply gives landlords the right to regulate, in certain limited respects, the installation of the cable television equipment that they are powerless to keep out.

Fourth, the language in § 228(1) about "the safety, functioning and appearance of

occupiers who wish to avail themselves of

the premises and the convenience and well being of other tenants" does not give WTA the right to force CSC to subsidize a competitor's operations at 66 Crisfield by demanding that plaintiff permit its competitors to use CSC's equipment to carry their signals. By its terms, the statutory language on which defendants rely permits landlords to set conditions for the installation of equipment by a franchised cable television operator. If CSC wanted to install new equipment, WTA could impose reasonable conditions on that installation. But there is nothing reasonable about insisting that a competitor be allowed to use CSC's existing equipment free of charge. In any event, CSC is not trying to install new equipment at 66 Crisfield; it simply seeks to protect its ownership rights in Equipment that was installed long ago.

The only other possible source of such authority is the Access Agreement, but that gives CSC sole ownership of the Equipment, with no caveats about use by competitors.

Digitech's conclusory assertion that it cannot compete at WT unless it is allowed to use CSC's Equipment is wholly without support in the record. To the extent defendants suggest that Digitech should be allowed to run its signal along CSC's Equipment because WTA would rather not have to make its tenants put up with the installation of cables that could be used to carry DirecTV, that is not CSC's problem. Digitech is free to compete with CSC at 66 Crisfield and it can do so as long as it is willing to make the same up-front investment that CSC made back in 1995. If WTA wants its members to have access to DirecTV, it will have to convince them to deal with whatever inconvenience Digitech's installation causes.

DirecTV.

The Equipment was paid for and installed by CSC, and is owned by CSC under the Access Agreement. There is no factual dispute that Digitech used CSC's wiring to serve its own customers, even after CSC expressed its opposition, pursuant to the Access Agreement. CSC is thus entitled to summary judgment on its claim of conversion.

*4. CSC is entitled to summary judgment on its Second Cause of Action for breach of contract.*

■ To state a claim in federal court for breach of contract under New York law, a complaint must allege: (1) the existence of an agreement; (2) adequate performance of the contract by plaintiff; (3) breach of contract by the defendant; and (4) damages. *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996) (citing *Tagare v. NYNEX Network Sys. Co.,* 921 F.Supp. 1146, 1149 (S.D.N.Y.1996)).

■ WTA breached the Access Agreement by converting CSC's wiring to its own use. It is not disputed that, under the Access Agreement, CSC owns all of the Equipment it installed on the Premises. (Compl. ¶ 8; Answer, Exh A ¶ 8; Def. R. 56.1 Statement ¶ 5(b).) WTA's only defense is that it was privileged to permit Digitech to use CSC's Equipment under the FCC rules and Public Law § 228(1). For the reasons discussed above, that defense is meritless. Therefore, the Condominium breached the Access Agreement by disregarding CSC's ownership of the Equipment and permitting Digitech to use it.

*5. CSC is entitled to summary judgment on its Fifth Cause Of Action, charging Digitech with intentionally interfering with the Agreement.*

■ In order to demonstrate tortious interference with contractual relations, plaintiff must prove: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages. *See M.J. & K. Co., Inc. v. Matthew Bender and Co., Inc.,* 220 A.D.2d 488, 490, 631 N.Y.S.2d 938, 940 (2d Dep't 1995). "Whether conduct which interfered with another's contractual relations is improper, and thus actionable, is determined by reference to a number of factors, including the nature of the conduct itself, the motives of the interfering party and the interests which it acts to protect, the interest with which it interferes and the relationship between the parties." *MLI Indus., Inc. v. New York State Urban Dev. Corp.,* 205 A.D.2d 998, 999, 613 N.Y.S.2d 977, 979 (3d Dep't 1994) (citations omitted).

There is no dispute that Digitech knew of the Access Agreement. Nor is there any dispute that Digitech persuaded the Condominium to permit it to utilize CSC's Equipment for its own commercial purposes. Digitech's only defense is the same as WTA's to the breach of contract claim: that its conduct was authorized under FCC regulations and PSL § 228(1). Digitech, like WTA, is wrong.

*6. Plaintiff is entitled to summary judgment dismissing Defendants' Sixth Counterclaim, for violation of Public Service Law § 228.*

Although neither party has moved for summary judgment dismissing the Sixth Counterclaim asserted against CSC, it must be dismissed as a matter of law.

The Sixth Counterclaim contends that Public Service Law § 228 prevents Cablevision from being the sole and exclusive provider of video services at the Building and compels it to permit the use of its Equipment for Digitech's service under

§ 228(1). For the reasons discussed at length above, this claim fails. WTA and Digitech were and are perfectly free to negotiate with and remunerate CSC for the use of its equipment, provided CSC is willing to entertain such negotiations. And WTA can place whatever restrictions it wants on Digitech if it permits Digitech to install equipment at 66 Crisfield. But those are all matters of private contract, not statute.

7. *CSC is not a state actor, so Defendants' Seventh Counterclaim must be dismissed.*

■■■ To prevail in a claim under 42 U.S.C. § 1983, plaintiff must first show that CSC, a private party, was "acting under color of state law" at the time he allegedly violated plaintiff's constitutional rights. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 527 (2d Cir.1996). "Actions by a private party are deemed state action if 'there is a sufficiently close nexus between the State and the challenged action' that the actions by the private parties 'may be fairly treated as that of the State itself.'" *Chan v. City of New York*, 1 F.3d 96, 106 (2d Cir.1993) (citations omitted). "The purpose of [the nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Id.*

No nexus may be found unless a private actor has willfully participated in a joint activity with the State or its agents. *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 551–52 (2d Cir.2001). "In the absence of such a nexus, a finding of state action may not be premised on the private entity's creation, funding, licensing, or regulation by the government. Nor is a private entity a state actor merely because its conduct is authorized by a state law, where its conduct is not compelled by the state." *Id.* (citing *Loce v. Time Warner Entm't Advance/Newhouse P'ship*, 191 F.3d 256, 266 (2d Cir.1999)). The mere fact that CSC is regulated by the FCC does not mean that it is a state actor.

Defendant cites *Baldwin v. Appalachian Power Co.*, 556 F.2d 241 (4th Cir.1977), for the proposition that Cablevision is acting under the color of state law for the purposes of § 1983 because it is clothed with and exercising a power usually exercised only by the state—the power to take property. In *Baldwin*, a public service corporation (in that case, an electrical company) was delegated the power of eminent domain under West Virginia law so that it could construct and maintain electric lines. The Court found that because the company had been given a state-granted right of entry into property, it was acting under color of state law. In this case, there is no similar state granted power of eminent domain. CSC owns the cable lines that Digitech seeks to use because of a private contract it made with the WTA, rather than pursuant to any state-granted right of entry. Thus, CSC is a not a state actor, and the Seventh Counterclaim is fatally flawed.

## THE ISSUES THAT ARE LEFT FOR TRIAL

The questions that remain, then, are (1) whether CSC is entitled to an injunction because Digitech, by co-locating its facilities on property that belongs to CSC pursuant to the Agreement, is violating 47 U.S.C. § 553; (2) whether the WTA breached its contract with CSC by unreasonably restricting its access to the building; (3) whether the WTA violated Public Service Law § 228(1) by unreasonably restricting CSC's access to the building; (4) whether the WTA intentionally interfered

with the contractual relations between the Condominium and CSC; and (5) whether CSC breached its contract with the WTA by not timely notifying the Building Manager about signal leakage. All of these issues must go to trial.

### 1. The Unauthorized Reception of Cable Service

█ Section 553(a)(1) of Title 47 provides that "no person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."

In its Seventh and Eight Causes of Action, CSC contends that defendants have interrupted Cablevision's communication service by splicing into its wiring without authorization. It points to the detection of signal leakage as evidence of this interruption.

Defendants respond that 47 U.S.C. § 553 was enacted to deter theft of cable service. They argue that there has been no evidence that defendants have been stealing CSC's service or have interrupted CSC's signal. Defendants also state that "It would be a sorry and sad abuse of the statute to criminalize a good faith attempt to make use of the FCC's Home Run Wiring Rules." (Def.'s Reply Br. at 16.)

Putting aside the fact that defendants could not possibly have invoked the home run wiring rules in good faith, See supra, at 250, 254–55, I cannot agree with them that, as a matter of law, § 553 does not apply to their conduct. While the legislative history of the Act evidences Congress's interest in deterring theft of cable services,[6] the language of the statute (to which I must first resort) proscribes any sort of interception of a cable television signal. Unfortunately, I cannot determine, as a matter of undisputed fact, whether defendants' splicing into CSC's wiring does or does not constitute an interception of CSC's signal. The record is devoid of testimony by any technically competent person on the subject, and the time for augmenting the record on these motions has long since expired. This issue will be determined by the appropriate trier of fact.[7]

█ Who that trier of fact might be is open to question. Defendants made a

---

6. "The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry—the theft of cable service. This problem has taken on many forms from the manufacture and sale of equipment intended to permit reception of cable services without paying for it, to apartment building dwellers 'tapping' into cable system wire in a building's hallway that is used for providing service to a neighbor's apartment unit, to the sale by building superintendents of cable converters left behind by previous tenants to new tenants. Such practices not only often permit one to obtain cable service without paying the installation and hook-up costs, but also, for instance, involve individuals gaining access to premium movie and sports channels without paying for the receipt of those services.

Theft of service is depriving the cable industry of millions of dollars of revenue each year which it should otherwise be receiving. The committee believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it."
H.R.Rep. No. 934 at 83, reprinted in 1984 U.S.C.C.A.N. 4655, 4720.

7. I do note that CSC is careful to talk about the "interruption" of its signal. It does not use the statutory word "interception." I draw no conclusion from CSC's choice of words at this time. At one point the lawyers tried to explain the technology to me, but they are hardly competent witnesses. On this point, we go to trial.

timely demand for a jury trial in this case. It is questionable whether it has any such right on the claim brought under § 553. It should go without saying that no right to a jury attaches to claims for equitable relief. *See Chauffeurs, Teamsters & Helpers Local 391 v. Terry*, 494 U.S. 558, 564, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); *Curtis v. Loether*, 415 U.S. 189, 193, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Daisy Group, Ltd. v. Newport News, Inc.*, 999 F.Supp. 548, 550 (S.D.N.Y.1998). Here, plaintiff seeks an injunction against further violation of the statute by Defendants. Plaintiff has ostensibly refrained from seeking any damages on this claim; however, it does seeks reimbursement for the cost of restoring its equipment. It is not clear whether such reimbursement qualifies as "damages" under § 553, or whether it is part and parcel of plaintiff's demand for equitable relief. Moreover, there is considerable dispute among district courts over whether there is a right to a jury trial in an action seeking statutory damages under 47 U.S.C. § 553. *Compare Time Warner Cable of New York City v. Kline, Davis & Mann, Inc.*, No. 00 Civ 2897, 2000 WL 1863763, at *3 (S.D.N.Y.2000); *National Satellite Sports, Inc. v. No Frills Rest., Inc.*, 15 F.Supp.2d 1360, 1364 (S.D.Fla.1998); *Joe Hand Promotions, Inc. v. Blarney Stone*, 995 F.Supp. 577, 579 (E.D.Pa.1998) *with National Satellite Sports, Inc. v. Prashad*, 76 F.Supp.2d 1359, 1362 (S.D.Fla.1999); *Storer Cable Communications v. Joe's Place Bar and Rest.*, 819 F.Supp. 593 (W.D.Ky.1993).[8]

The parties are directed to submit briefs in limine on the issue of whether defendants are entitled to a jury trial on the § 553 claims. Since defendants seek a jury trial, defendants should make the motion, and plaintiff shall respond.[9]

2. *CSC's Third Cause of Action for Breach of Contract and Sixth Cause of Action for Interference with Contractual Relations*

CSC claims that the both WTA and Westchster Terrace breached the Access Agreement by restricting CSC's access to the Building, and that WTA induced Westchester Terrace to commit that breach. The Access Agreement provides that Cablevision will have "reasonable access" to install, maintain and remove Equipment during weekdays from 8 a.m. to 5 p.m. (Except in emergencies when Cablevision may contact the managing agent to obtain access) and that the "Superintendent or the managing agent can authorize Cablevision to enter the premises." By letter dated August 9, 2001, defendants' attorney imposed restrictions on Cablevision's access. Whether the WTA's restrictions on CSC's access to the building were "reasonable" is a question to be decided at trial. Frankly, the record is devoid of evidence that would permit me to dispose of this issue on motion. Since CSC seeks only injunctive relief on this claim, it will be tried to the Court.

3. *Plaintiff's Fourth Cause of Action against the WTA for violating PSL § 228*

Plaintiff's Fourth Cause of Action contends that WTA has violated § 228(1) by restricting Cablevision's access to the premises. This, too, will be decided at trial, since the record on this issue is far from complete. For example, I do not know whether WTA's restrictions have in-

---

8. Whether reimbursement falls within the ambit of statutory damages is highly doubtful.

9. Since the relief sought in plaintiff's Federal claim is duplicative of relief to which plaintiff is entitled under its claim for conversion, plaintiff may now wish to drop that claim, although it would leave us with no Federal claim in the action.

terfered with CSC's installation of cable equipment. Again, CSC seeks only an injunction against further violation of the statute, so we will hold a bench trial.

### 4. *Defendants' Breach of Contract Counterclaim*

In its Fifth Counterclaim, WTA asserts that CSC violated the provision of their agreement that states:

a. [The Association] shall have the right to review all plans, drawings, specifications and construction notes of the Company prior to commencement of the work. Construction notes shall be approved by the [Association] prior to the commencement of work and shall be approved by [the Association] prior to commencement of work and shall be subject to the conditions set forth herein.

b. Any installation on any floor shall be within the walls only, and only after specific approval by [the Association].

c. In the event of an emergency, the Company shall contact the Owner/Manager and advise it of the nature and extent of such emergency.

(Access Agreement, Exh. A to Def.'s Motion for Summ. J. at 1.) WTA claims that CSC did not provide plans for or get the approval of the Association when it installed the Drops in the hallway ceilings of the building, and is in violation of the Agreement by not putting the Drops in the walls. The WTA also asserts that Cablevision did not fix the alleged signal leakage at the time of its discovery, and did not advise the Association about the alleged signal leakage until a week after it was discovered.

Summary judgment was not sought on this counterclaim, and rightly so. The rec-

ord before me is devoid of evidence on this subject. However, I note that the claim may be time barred. A breach of contract claim must be brought within six years of the breach. *See* CPLR § 213. This action was not commenced until August 20, 2001. The drops were installed sometime in 1995. I do not know in which month. There is no allegation that CSC installed the drops in secret (hardly likely) or that WTA did not know back in 1995 that the drops ran above the ceiling as opposed to behind the walls.[10] I raise this issue so that the parties will be aware of it; they should be prepared to address it at trial.

### CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are granted in part and denied in part.

This constitutes the decision and order of the Court.

---

10. Having visited the site, I question defendants' good faith in asserting this counterclaim, at least insofar as it speaks to the location of the cable wires. The cables were installed in the place that appears least disruptive to tenant comfort and least damaging to the building.