**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 27 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

TIME WARNER ENTERTAINMENT
COMPANY, L.P., a Delaware limited
partnership; and LIBERTY CABLE
OF MISSOURI, INC., a Missouri
corporation,

       Plaintiffs - Counter Defendants
       - Appellants,

v.

EVEREST MIDWEST LICENSEE,
L.L.C., dba Everest Connections
Corp.,

       Defendant - Appellee,

ATRIUM PARTNERS, L.P., a Kansas
limited partnership,

       Defendant - Counter Claimant -
       Appellee.

NATIONAL MULTIHOUSING
COUNCIL, COMMUNITY
ASSOCIATIONS INSTITUTE,
INSTITUTE OF REAL ESTATE
MANAGEMENT, NATIONAL
APARTMENT ASSOCIATION,
NATIONAL ASSOCIATION OF
REAL ESTATE INVESTMENT
TRUSTS, REAL ESTATE
ROUNDTABLE, AND REAL
ACCESS ALLIANCE,

       Amici Curiae.

No. 03-3005

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 02-CV-2343-CM)**

Michael W. Quinn (Bernard J. Rhodes, Lathrop & Gage, L.C., Kansas City, Missouri, with him on the briefs), Time Warner Cable, Stamford, Connecticut, for the Plaintiffs-Appellants.

Lee M. Smithyman (Rachel Lipman Reiber, Everest Midwest Licensee, L.L.C., Kansas City, Missouri, with him on the brief), Smithyman & Zakoura, Chartered, Overland Park, Kansas, for the Defendant-Appellee.

Matthew C. Ames, Gerard Lavery Lederer, Miller & Van Eaton, P.L.L.C., Washington, D.C.; Roger Platt, Vice President & Counsel, The Real Estate Roundtable, Washington, D.C.; Molly Foley-Healey, Community Associations Institute, Alexandria, Virginia; Tony Edwards and Robert Cohen, National Association of Real Estate Investment Trusts, Washington, D.C., on the brief for the Amici Curiae.

Before **LUCERO**, **McKAY**, and **HARTZ**, Circuit Judges.

**LUCERO**, Circuit Judge.

At issue in this case is the application of the Federal Communication Commission's ("FCC") cable television "inside wiring rules" under an agreement which grants an incumbent cable provider, Time Warner, a license to maintain the cable wiring its predecessor installed within an apartment complex, The Atriums. The Atriums argues that the license is limited to the wiring currently being used

to provide cable television services, and therefore that it may invoke an FCC regulation which requires the incumbent cable provider to sell, abandon, or remove wiring the incumbent cable provider no longer has an legally enforceable right to maintain. See 47 C.F.R. § 76.804. The district court agreed, finding that the license between Time Warner and The Atriums did not extend to wiring not in use providing cable services, and accordingly that The Atriums could invoke the regulations against Time Warner. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM**.

## I

In April 1987, Joseph Tutera, representing The Atriums, a multi-unit retirement complex, entered into a non-exclusive license agreement with TeleCable of Overland Park ("TeleCable"), Time Warner's predecessor, to provide cable television to The Atriums. The Atriums and TeleCable (now Time Warner[1]) executed the standard license agreement, without change; according to the agreement Time Warner received "the right, license and permission to install, operate and maintain" the equipment necessary "to provide CATV and Pay TV services" to The Atriums' tenants. (I App. at 17.) By the contract's terms Time Warner retains property ownership of the equipment installed.

---

[1] As Time Warner is TeleCable's successor, all references in the opinion going forward will be to Time Warner.

-3-

Pursuant to the agreement, Time Warner installed a cable distribution system at The Atriums. There are three general parts to a cable distribution system. First, there is the riser, a large cable that runs into the building through a utility closet on the ground floor, and up through utility closets on each of the floors. Next runs the "home run wiring" at issue in this litigation, which consists of wires that run from the riser through the hallway ceilings on each floor and toward each individual apartment. Finally, there are "home wires"; approximately twelve inches outside each apartment the "home run wiring" becomes "home wires" (there is no physical demarcation between "home run wires" and "home wires"). The "home wires" run into each individual apartment unit. See 47 C.F.R. § 76.5(ll–mm).

In June 2002, The Atriums sent a letter to Time Warner, stating that it intended to allow Everest Midwest Licensee ("Everest"), which received a franchise to provide telecommunication services in Overland Park in the summer of 2001, to compete with Time Warner in the provision of cable television and high speed internet services in The Atriums. To accomplish this goal, The Atriums demanded Time Warner elect to abandon, sell, or remove its home run wires in The Atriums which were not currently being used by Time Warner subscribers, pursuant to recently enacted FCC regulations, specifically 47 C.F.R. § 76.804(b). Section 76.804(b)(1) states:

Where an MVPD [multichannel video programming distributor] owns the home run wiring in an MDU [multiple dwelling unit] and does not (or will not at the conclusion of the notice period) have a legally enforceable right to maintain any home run wire dedicated to an particular unit on the premises against the MDU owner's wishes, the MDU owner may permit multiple MVPDs to compete for the right to use the individual home run wires dedicated to each unit in the MDU. . . . The incumbent MVPD will then have . . . to provide a single written election to the MDU owner as to whether, for each and every one of its home run wires dedicated to a subscriber who chooses an alternative provider's service, the incumbent MVPD will: remove the wiring and restore the MDU building consistent with state law; abandon the wiring without disabling it; or sell the wiring to the MDU owner. If the MDU owner refuses to purchase the home run wiring, the MDU owner may permit the alternative provider to purchase it. If the alternative provider is permitted to purchase the wiring, it will be required to make a similar election . . . for each home run wire solely dedicated to a subscriber who switches back from the alternative provider to the incumbent MVPD.

47 C.F.R. § 76.804(b)(1).

In its letter invoking § 76.804(b), The Atriums expressed hope that Time Warner would agree to sell the home run wiring to Everest, as it perceived that such an outcome would "facilitate the ability of tenants to switch from Time Warner to Everest and vice versa on a seamless basis." (I App. at 165.) Time Warner refused, arguing that an MDU owner may invoke the regulations only when the incumbent provider lacks a legally enforceable interest in maintaining the home run wires on the property. Claiming that it retained a legally enforceable interest, Time Warner relied on its interpretation of the license agreement between The Atriums and Time Warner, which stated, in part, that:

-5-

1. Subject to the terms and conditions hereinafter set out, Owner [The Atriums] hereby grants to TeleCable [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as TeleCable [Time Warner] deems necessary or desirable in or on the Owner's [The Atriums'] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project. TeleCable [Time Warner] shall have the right to enter the Project at any time to perform maintenance on and make repairs and replacements of the facilities, or any part thereof, and to install or disconnect customers.

(I App. at 17.) As a result, Time Warner concluded that under the license agreement it retained a legal right to maintain all of its home run wiring. Under this interpretation of the agreement, The Atriums could allow Everest into the building to construct its own cable services facilities, i.e., lay its own wiring; however, Time Warner was not obligated under § 76.804(b) to abandon, sell, or remove its home run wiring in The Atriums.

Time Warner proceeded to file suit in federal district court in July 2002, seeking a declaratory judgment that 47 C.F.R. § 76.804(b) did not apply to its home run wiring in The Atriums.[2] Specifically, Time Warner maintained that it had a preexisting, legally enforceable right to maintain its wires on the property. Time Warner also requested a preliminary injunction preventing The Atriums from invoking the regulations. The parties agreed to consolidate the hearing on

---

[2] 47 C.F.R. § 76.804(c) provides that "[t]he procedures set forth in paragraphs (a) and (b) of this section shall apply unless and until the incumbent provider obtains a court ruling or an injunction within forty-five (45) days following the initial notice enjoining its displacement."

Time Warner's preliminary injunction motion with a hearing on the merits. Time Warner Entertainment Co., LP v. Atriums Partners, LP, 232 F. Supp.2d 1257, 1258 (D. Kan. 2002). On November 26, 2002, the district court denied the request for the preliminary injunction and found that Time Warner had a legal right only to the home run wires running to apartments of current Time Warner subscribers. Id. at 1268. For the home run wires running to apartments of non-subscribers, the district court found that The Atriums could invoke § 76.804(b), thereby requiring Time Warner to abandon, sell, or remove those home run wires. Id. at 1269. Time Warner appeals.

## II

Because the federal home run wiring regulations only apply if an incumbent provider no longer has a legally enforceable right to maintain its home run wires in an MDU, our interpretation of the license agreement necessarily implicates whether the federal regulations apply in this circumstance. However, in addition to analyzing the license agreement between Time Warner and The Atriums, we must also interpret the federal regulations in order to determine if the regulations apply to the facts before us. The FCC regulations contain two provisions potentially relevant to the home run wiring at issue: the building-by-building provision and the unit-by-unit provision. See 47 C.F.R. § 76.804(a) & (b). Under either of the two home run wiring provisions, Time Warner is not obligated to

-7-

abandon, sell, or remove its home run wiring if it has a legally enforceable right to either remain on the premises (in the building-by-building context) or maintain any particular home run wiring (in the unit-by-unit context). Id. Accordingly, we begin with an analysis of the license agreement between Time Warner and The Atriums, followed by an analysis of the federal regulations at issue.

## A

State law claims[3] before a federal court on supplemental jurisdiction are governed by state law, Olcott v. Del. Flood Co., 327 F.3d 1115, 1126 (10th Cir. 2003), and we review a federal district court's determination of state law de novo. Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991). Whether a contract's language is ambiguous is also reviewed de novo. Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist., 226 F.3d 1170, 1178 (10th Cir. 2000). "Where the parties have negotiated and entered into a written contract which

---

[3] Time Warner filed suit in the United States District Court, District of Kansas pursuant to 28 U.S.C. §§ 1331 & 2201, and as required by the home run wiring regulations, 47 C.F.R. § 76.804(c), seeking a declaratory judgment regarding the applicability of the FCC home run wiring regulations under the license between Time Warner and The Atriums. Because the interpretation of the license agreement was necessary to Time Warner's request for a declaratory judgment, the district court properly had jurisdiction over the contract claims under 28 U.S.C. § 1367. Neither party disputes that Kansas law governs the license interpretation in this case.

addresses the issues negotiated between them, the written contract determines their rights," Flight Concepts Ltd. P'ship v. Boeing Co., 38 F.3d 1152, 1157 (10th Cir. 1994) (citing Albers v. Nelson, 809 P.2d 1194, 1197 (Kan. 1991)), and no interpretation by the court is necessary. However, if the language of a contract is susceptible to conflicting interpretations, the contract is ambiguous, Liggatt v. Employers Mutual Casualty Co., 46 P.3d 1120, 1125 (Kan. 2002), and interpretation is required.

In interpreting a contract, the primary role of the court is to ascertain and effectuate the parties' intentions where possible. In re Villa West Assoc. v. Kay, 146 F.3d 798, 803 (10th Cir. 1998) (citing Ryco Packaging Corp. v. Chapelle Int'l, Ltd., 926 P.2d 669, 674 (Kan. Ct. App. 1996)). "Reasonable rather than unreasonable interpretations of contracts are favored," and accordingly, interpretations which lead to absurdity or negate the purpose of the contract should be avoided. In re Villa, 146 F.3d at 803 (quoting Kansas State Bank & Trust Co. v. DeLorean, 640 P.2d 343, 349 (Kan. Ct. App. 1982)). All provisions of the agreement should be read "together and in harmony with each other." Berry v. Farmland Indust., Inc., 114 F. Supp.2d 1150, 1157 (D. Kan. 2000) (quoting In re Cherokee County, Kansas Health Care Facility Revenue Bonds, 946 P.2d 83, 91 (Kan. 1997). Where a contract's terms are ambiguous, those terms should be construed strictly against the drafter and liberally toward the non-

drafting party. Dillard Dep't Stores, Inc. v. Kan. Dept. of Human Res., 13 P.3d 358, 363 (Kan. Ct. App. 2000).

The Atriums argues on appeal that our interpretation of the contract should be informed by three factors: (1) Time Warner drafted the agreement; (2) the agreement was a contract of adhesion; and (3) the anticompetitive nature of Time Warner's interpretation of the agreement is against the public interest. Therefore, The Atriums urges, we must read the agreement narrowly, any ambiguity should be construed strictly against Time Warner, and the agreement should be liberally construed to favor the public. Addressing the interpretation of the contract between Time Warner and The Atriums, the district court noted that its construction was informed by those factors. First, the district court found, because Time Warner drafted the license agreement, any ambiguity found therein must be construed strictly against Time Warner. Second, because there was essentially no competition in the cable services market when The Atriums signed the licensing agreement, the district court concluded that the contract was an adhesion contract, which also required that the agreement be strictly construed against Time Warner. Last, because this license agreement affected the public interest, the court liberally construed the contract to favor the public.

Neither party disputes that Time Warner drafted the agreement, and we agree that under Kansas law any ambiguity in the agreement is to be construed

against the drafter, Dillard Dep't Stores, 13 P.3d at 363. Accordingly, we will do so where appropriate. We also agree that this license agreement affects the public interest and should therefore be liberally construed, where appropriate, to favor the public.[4] "[C]ontracts affecting the public's interest generally are liberally interpreted to favor the public." Simon v. Farmland Indus., Inc., 505 F. Supp. 59, 61 (D. Kan. 1980) (citation omitted); Restatement (Second) of Contracts § 207 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred."); 5 A. Corbin, Corbin on Contracts § 24.25 (rev. 1998) ("[C]ourts favor a construction in the public interest . . . . [C]ontracts by which the public interest is affected should be interpreted in the manner most favorable to the public. . . . [T]his rule is often applied to contracts involving public franchises.").

Not only does this contract involve the interpretation of a license granted to a public franchise; in this case, the contract implicates The Atriums' right to avail itself of regulations promulgated by the FCC to encourage competition amongst cable services providers in the MDU market. See 47 U.S.C. § 521(6) (purposes of cable regulations). The FCC estimates that as of 1997, thirty million Americans resided in MDUs, and there were approximately 600,000 MDUs in the United

---

[4] Because we will construe any ambiguity strictly and against Time Warner as drafter, we need not reach the issue of whether the license agreement was one of adhesion.

-11-

States.  Inside Wiring, 62 Fed. Reg. 61016, 1997 WL 704275 at *61018 (Jan. 29, 2003) (to be codified at 47 C.F.R. pt. 76) ("Final Rule").  Moreover, when the city of Overland Park licensed Time Warner, it considered in its franchise grants whether the franchise "provide[s] to the residents of the City a useful and desirable service for the benefit of the public welfare of the residents." (I App. at 104.)  Finally, both the Everest and Time Warner franchise grants are subject to city regulation of the services provided and rates charged.  (See, e.g., id.; I App. at 48; I App. at 88.)  Given this evidence, we conclude that this contract affects the public interest and where appropriate, we will construe it accordingly.

The Atriums contends that under such a reading the license agreement granted Time Warner only the right to provide cable television to a tenant; therefore, if Time Warner is not actually providing cable television to such tenant, it retains no legally enforceable right to maintain any wiring to that tenant's residence.  Time Warner counters that, when read as a whole the license agreement is unambiguous and grants Time Warner a legally enforceable right to maintain all of its home run wires at The Atriums, regardless of whether the home run wires are currently in use by Time Warner to provide cable television to tenants.

With respect to the question of whether Time Warner retains a legally enforceable right to maintain its home run wiring at The Atriums, the following

-12-

clauses of the license agreement between Time Warner and The Atriums are

particularly relevant:

PREMISES:

. . .

C.  TeleCable [Time Warner] desires to install, operate and maintain its cable, junction boxes, and other facilities incidental or related to the provision of its services to tenants in the Project ("the facilities") in order to serve those tenants of Owner [The Atriums] who shall from time to time pay TeleCable [Time Warner] for its services; . . .

D.  Owner [The Atriums] recognizes that the provision of TeleCable [Time Warner] of cable television and Pay TV service to tenants in the Project is of benefit to Owner [The Atriums], and accordingly, Owner [The Atriums] is willing to grant the license and permissions hereinafter set forth:

NOW, THEREFORE, the parties hereto agree as follows:

1.  Subject to the terms and conditions hereinafter set out, Owner [The Atriums] hereby grants to TeleCable [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as TeleCable [Time Warner] deems necessary or desirable in or on the Owner's [The Atriums'] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project.  TeleCable [Time Warner] shall have the right to enter the Project at any time to perform maintenance on and make repairs and replacement of the facilities, or any part thereof, and to install or disconnect customers.

2. . . . It is agreed that the facilities installed by TeleCable [Time Warner] in the Project or elsewhere on Owner's [The Atriums] property shall be and remain the sole and exclusive property of TeleCable [Time Warner] and shall be treated as personal property of TeleCable [Time Warner] for all purposes.

(I App. at 17–18.)

These considerations in mind, we must determine whether Time Warner

-13-

retains a legally enforceable right under its license agreement to maintain all of its home run wiring in The Atriums. The district court relied in part upon section C of the "PREMISES" of the license agreement, which states:

> TeleCable [Time Warner] desires to install, operate and maintain its cable, junction boxes, and other facilities incidental or related to the provision of its services to tenants in the Project ("the facilities") in order to serve those tenants of Owner [The Atriums] who shall from time to time pay TeleCable [Time Warner] for its services[.]

(I App. at 17.) Accordingly, the district court concluded that the license granted Time Warner the right to maintain its facilities only when it was providing service to a tenant. Reasoning that "provide" does not mean that Time Warner can "store" its wires in anticipation of offering services to new tenants, the district court determined that "provide" limits Time Warner's rights to only those home run wires currently in use by Time Warner subscribers. Time Warner, 232 F. Supp. 2d at 1267. As a result, the court determined, Time Warner simply has no license pertaining to the home run wires running to apartments not currently subscribing to Time Warner's cable television services. In addition, the district court reasoned that the phrase "in order to serve those tenants of Owner who shall from time to time pay [Time Warner] for its services" is ambiguous and best resolved against Time Warner to refer to tenants who periodically pay (i.e. monthly) Time Warner for its services. Id. Finally, the district court concluded that while Time Warner maintains ownership of unused wiring, its license extends

-14-

to the <u>provision</u> of cable services; because Time Warner clearly has no right to provide cable services to tenants who have not requested such services, its ability under the license agreement to maintain facilities in order to provide service extends only to current subscribers of Time Warner. <u>Id.</u> at 1268.

On appeal, Time Warner contests the district court's interpretation of the license agreement on three main grounds:  (1) the agreement is unambiguous; (2) the clear language supports Time Warner's interpretation of the agreement; and (3) the district court's interpretation results in absurdity.  First, Time Warner argues that the agreement is not ambiguous, and that the parties' intent is easily determined in the context of the entire agreement; that intent, Time Warner contends, was to grant Time Warner a license to maintain all of its home run wiring in The Atriums, including unused home wiring, in anticipation of offering its services to tenants in the future.  Bolstering its argument that this interpretation reflects the parties' intent as measured when the agreement was entered into in 1987, Time Warner draws our attention to the fact that for the fifteen years following its entry into the agreement, The Atriums allowed Time Warner to maintain all of its home run wires, regardless of whether the particular apartment's tenant was a current subscriber.  However, this objection ignores The Atriums' contention that Time Warner was the only available cable services provider in Overland Park when the agreement was signed; therefore, The

Atriums could not have sought to allow another provider to buy or use Time Warner's home run wires to provide cable service in the building. Also notable is the fact that Everest was granted a license to offer cable services in Overland Park only a year before The Atriums sought to introduce Everest as a competitor to Time Warner in the building. As a result, we consider Time Warner's argument that The Atriums' fifteen year acquiescence in Time Warner's exclusive provision of cable services as inconclusive evidence of the parties' intent.[5]

Second, Time Warner argues that the clear language of the agreement granted it the right to operate and maintain such facilities as necessary or desirable for Time Warner to be able to provide cable services to the tenants of The Atriums. Because the agreement clearly contemplated that Time Warner would retain ownership of the wiring and was given access to maintain those facilities, and because, according to Time Warner, numerous provisions in the

---

[5] Suggesting that The Atriums would not have demanded Time Warner remove any unused cable wiring, and accordingly that The Atriums would not have objected to an unconditional license, the dissent suggests that the agreement should be read to grant Time Warner an unconditional license. However, we agree with the dissent that The Atriums would not have demanded the costly and purposeless removal of wiring in the absence of an alternative cable provider because it would have been plainly against its self-interest. However, this observation explains just as persuasively why Time Warner would not have demanded an unconditional license when the contract was entered into—viz., it would have been unnecessary. Thus, the license is more reasonably read as being conditioned on the provision of cable services. Moreover, as noted above, in the event of ambiguity the license must be read strictly against Time Warner.

-16-

license agreement contemplate that it would not be continually supplying cable services to all units, it insists that the agreement unambiguously grants it a legally enforceable right to maintain all the home run wires. The district court's interpretation, Time Warner stresses, improperly emphasizes the phrase "in order to provide" service at the expense of the other clauses of the agreement. In fact, Time Warner insists that "in order to provide" was a mere "descriptive clause" which "cannot reasonably be read to limit the term of the license granted." (Appellant Br. at 26.)

We disagree; to the contrary, the license agreement's purpose is clearly stated in the "PREMISES" section of the agreement, i.e., The Atriums grants Time Warner a license in order to provide cable television services. (See License Agreement C ("TeleCable [Time Warner] desires to install, operate and maintain . . . facilities incidental or related to the provision of its services to tenants . . . in order to serve those tenants of Owner [The Atriums] who shall from time to time pay TeleCable [Time Warner] for its services") and D ("Owner [The Atriums] recognizes that the provision of . . . cable television and Pay TV service to tenants . . . is of benefit to Owner [The Atriums], and accordingly, Owner [The Atriums] is willing to grant the license and permissions hereinafter set forth"), I App. at 17.) The installation and maintenance of the cable wiring is expressly incidental and related to the primary purpose of the license—the

provision of cable services to tenants of The Atriums. Indeed, "in order to serve those tenants . . . who shall from time to time pay TeleCable" seems best read to mean that the license is limited to the maintenance of wiring related to the <u>provision</u> of cable services to <u>current</u> Time Warner subscribers. We are simply not persuaded that the district court was incorrect in focusing on the primary purpose of the agreement—the provision of cable services—in its analysis.[6]

Next, Time Warner argues that the district court's interpretation of the contract leads to absurdity in that the logical conclusion of its reading is that Time Warner's license vanishes each time a tenant moves out, a tenant cancels its subscription with Time Warner, or a tenant chooses a competing cable service. Not only do we disagree with Time Warner that the district court's interpretation of the contract is absurd; we consider it to be the most reasonable interpretation. First, the license agreement explicitly provides Time Warner access to The

---

[6] The dissent argues that our reliance on language in the preamble of the contract is erroneous and leads to an unjustified emphasis on the purpose of the contract—provision of cable TV services to tenants of The Atriums. Notably, the preamble's emphasis on the provision of cable services is echoed in the numbered provisions of the contract, i.e., Time Warner has the right to "install, operate and maintain such of the facilities as [Time Warner] deems necessary or desirable . . . <u>in order to provide</u> CATV and Pay TV services to tenants." (License Agreement 1, I App. at 17.) (emphasis added.) The scope of the contract is therefore limited by the purpose of the contract—to provide cable TV services—in the operative sections just as it is informed by the purpose in the preamble.

-18-

Atriums during transition periods such as the installation or cancellation of services. "TeleCable [Time Warner] shall have the right to enter the Project at any time . . . to install or disconnect customers." (License Agreement, 2, I App. at 17.) Thus, the license anticipates that subscriptions to cable services will be periodically entered into and cancelled, and provides for that eventuality. If Time Warner had a right to enter The Atriums at any time to maintain unused wires, it would be unnecessary to include a clause that ensured that it had access to The Atriums to start and stop service, for Time Warner could simply enter at any time to maintain any wiring. Moreover, the installation clause makes perfect sense when the agreement is read as the district court indicated, to wit, that Time Warner's license to maintain the wires extends only to those wires which are currently in use to provide cable television services, and that the installation clause extends the license granted to Time Warner to enter the building to those periods required to start and stop service.[7]

Further, subsection C of the license agreement conditions the installation, operation, and maintenance of cable wiring on the provision of cable services. (See License Agreement, C, I App. at 17.) The installation, operation, and

---

[7] The license agreement specifically grants Time Warner "permission to install [its cable equipment] . . . in order to provide CATV and Pay TV services to tenants" of The Atriums. (License Agreement, 1, I App. at 17.) Given this express provision, the dissent's suggestion that our reading would not allow Time Warner to install cable wiring in the absence of a subscription is unpersuasive.

maintenance of the wiring is for the sole purpose of "serv[ing] those tenants

. . . who shall from time to time pay [Time Warner] for its services." Id. Nothing

in this clause, or any other clause of the agreement, implies that Time Warner has

a license to install, operate, or maintain wiring for any purpose other than

providing cable television services, nor is there any indication that Time Warner

could refuse to provide cable television services, yet continue to maintain its

wiring. In fact, section 1 of the license agreement reiterates that the license is

granted "in order to provide CATV and Pay TV services to tenants" of The

Atriums. (License Agreement, 1, I App. at 17.)

Additionally, Time Warner is required, under the new FCC regulations, to

sell, abandon, or remove home run wiring which it lacks a legally enforceable

right to maintain. See 47 C.F.R. § 76.804(a) & (b). As a result, under our

reading of the license agreement, should a tenant cancel service with Time

Warner, Time Warner would have to sell its lines to a competitor.[8] Similarly, if

the tenant then cancelled its subscription with a competitor, and wished to

subscribe with Time Warner, that competitor would then be obligated to sell the

lines to Time Warner under the regulations.[9] We recognize that the FCC's

regulations were not in existence at the time the parties entered into the

---

[8] Or abandon or remove its home run wiring.

[9] Or abandon or remove its home run wiring.

-20-

agreement; however, as demonstrated above, the license itself anticipated that Time Warner's right to enter the premises would be conditioned on whether it was actively providing service to a particular unit. We observe only that our interpretation of the agreement, even following the promulgation of the FCC regulations, results in a logical and tenable outcome.

Finally we note that Time Warner's interpretation suffers from the same fault it attributes to the present reading; specifically, it reads clauses of the agreement out of existence. Under Time Warner's reading, it would retain a license to maintain home run wiring even if it was providing no cable television services to any resident of The Atriums, or if it were to lose its franchise rights in Overland Park. Time Warner's interpretation would therefore read out of the agreement the phrases "facilities incidental or related to the provision of its services to tenants . . . in order to serve those tenants . . . who shall from time to time pay [Time Warner] for its services", "in order to provide CATV and Pay TV services to tenants." (License Agreement C, 1, I App. at 17 (emphasis added).)

We conclude that the overriding purpose of the license agreement was the provision of cable television services to the residents of The Atriums; any interpretation of the license agreement which would allow the license to continue without the provision of cable services is directly contrary to the purpose of the agreement and must be disfavored. Consequently, we agree with the district court

that the license agreement grants Time Warner a legally enforceable right to maintain its home run wiring to a particular unit only when Time Warner is providing cable services to that unit.

**B**

Having decided that the district court's interpretation of the license agreement was correct, we turn to whether the district court properly interpreted the FCC's home run wiring regulations to deny Time Warner's request to permanently enjoin The Atriums from invoking the procedures outlined in § 76.804(b).  We review the district court's interpretation of federal regulations de novo, United States v. Brown, 348 F.3d 1200, 1208 (10th Cir. 2003), applying general rules of statutory construction, beginning with the plain language of the regulations.  Valley Camp of Utah, Inc. v. Babbitt, 24 F.3d 1263, 1270 (10th Cir. 1994), see also, Aspenwood Investment Co. v. Martinez, 355 F.3d 1256, 1261 (10th Cir. 2004).  As with statutory construction, in interpreting regulations, we strive to construe the text so that all of its provisions are given effect and no part is rendered superfluous.  APWU, AFL-CIO v. Potter, 343 F.3d 619, 626 (2d Cir. 2003).  Additionally, a regulation must be interpreted in such a way as to not conflict with the objective of its organic statute.  Joy Technologies, Inc. v. Sec. of Labor, 99 F.3d 991, 996 (10th Cir. 1996).

To set the proper stage for our analysis, we review briefly the context under which the federal regulations were enacted.  The home run wiring regulations at

issue were developed under the auspices of the Cable Television Consumer Protection and Competition Act, Pub. L. 102-385, 106 Stat. 1460 (1992), which instructed the FCC to promulgate rules which would "enable consumers to utilize the wiring with an alternative multichannel video delivery system and avoid any disruption the removal of such wiring may cause." H.R. Rep. No. 102-628 at 118 (1992). See 47 U.S.C. § 544(i) (directing the FCC to prescribe rules regarding the disposition of cable wiring upon termination of cable service). "The new rules were intended to foster opportunities for multichannel video programming distributors ('MVPDs') to provide service in multiple dwelling unit buildings ('MDU's') by establishing procedures regarding how and under what circumstances the existing cable home run wiring would be made available to alternative video service providers." FCC First Order on Reconsideration and Second Report and Order, In the Matter of Telecommunications Services Inside Wiring: Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Cable Home Run Wiring, CS Docket No. 95-184, MM Docket No. 92-260, 2003 WL 183999, at *1343 (Jan. 29, 2003) ("FCC Second Report"); 47 C.F.R. § 76.800 (Definitions). Moreover, the rules were "adopted for the purpose of facilitating competition between and among MVPDs. Competition is welcome." FCC Second Report at *1355.

To foster competition, the home run wiring rules establish the procedures

used to require "the sale, removal, or abandonment of home run wiring in MDU's where the incumbent provider no longer has an enforceable right to remain in the building or serve particular units," and the MDU owner intends either to terminate service by the incumbent for the entire building or to allow more than one MVPD to compete to use the home run wiring on a unit-by-unit basis. Id. at *1344; 47 C.F.R. § 76.804(a) & (b). The new home run wiring rules also require that "[a]fter the effective date of this rule, MVPDs shall include a provision in all service contracts entered into with MDU owners for the disposition of any home run wiring in the MDU upon the termination of the contract." 47 C.F.R. § 76.804(d). Thus, the rules attempt to remove an impediment to competition among cable providers in multiple dwelling units—the reluctance of MDU owners to allow the installation of multiple home run wires by alternative cable service providers in their buildings due to concerns regarding aesthetics and possible property damage, disruption and inconvenience to residents, and space constraints. See Final Rule at *61018. "By facilitating the entry of new providers into MDU communities" the cable inside wiring rules are intended to advance Congress's directive to provide a "pro-competitive, de-regulatory national policy framework" to encourage the provision of "advanced information technologies and services to all Americans." FCC Second Report at *1344.

Section 76.804 of the "cable inside wiring rules" addresses the disposition

of home run wiring.  47 C.F.R. § 76.804.  The rule is divided into two parts: building-by-building disposition of home run wiring (subsection (a)), and unit-by-unit disposition of home run wiring (subsection (b)).  Under § 76.804(a), the building-by-building section, a multichannel video programming distributor ("MVPD"), which does not have "a legally enforceable right to remain on the premises against the wishes" of the multiple dwelling unit ("MDU") building owner, must upon receiving notice from the MDU that it intends to invoke the procedures of this section, either remove all the home run wiring inside the MDU, abandon the home run wiring without disabling it, or sell the wiring to the building owner.  47 C.F.R. § 76.804(a)(1).  Thus, the home run wiring regulations allow a building owner under an exclusive contract with a single incumbent provider to contract with a new cable services company to provide exclusive services to the entire building if the incumbent provider no longer has a legally enforceable right to remain on the premises.  Under such circumstances, the incumbent, who is no longer providing cable service to the building, has the option of selling, abandoning, or removing its home run wires.

Under the unit-by-unit section, § 76.804(b), the same options regarding the home run wiring are found:  the MVPD must remove, abandon, or sell its home run wiring.  This subsection varies only in that the MVPD's obligation is triggered when it receives notice from the MDU if the MVPD does not "have a

-25-

legally enforceable right to maintain <u>any particular home run wire dedicated to a particular unit</u> on the premises against the MDU owner's wishes."  47 C.F.R. § 76.804(b)(1) (emphasis added).  Thus, under this provision, the owner could choose to allow competition among MVPD's for the right to provide service in an individual unit, if the incumbent has no right to maintain the home run wire running to that particular unit.  Under this regulation more than one cable services provider will be present and competing within an individual building.

The relevant issue for our purposes is whether § 76.804(b)'s unit-by-unit provisions should apply in this case, given our conclusion that Time Warner does not have a legally enforceable right to maintain home run wiring to units to which it does not provide cable service.  One federal district court has addressed a similar situation.  Although its conclusion is not binding on us, we consider it in some detail.  In <u>CSC Holdings</u>, the district court for the Southern District of New York found that as long as a provider "retains the right to service so much as one customer in the building" the home run wiring regulations—both § 76.804(a) & (b)—are inapplicable.  <u>CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condo., et al</u>, 235 F. Supp.2d 243, 248 (S.D.N.Y. 2002).  Applying this logic to the case before us, Time Warner argues that because it retains a license to provide cable services to current subscribers, The Atriums can invoke neither the building-by-building nor unit-by-unit home run wiring regulations.

To support its conclusion that the home run wiring regulations do not apply in situations where the incumbent cable provider retains the right to service at least one subscriber in the building, the CSC Holdings court relied upon paragraph 69 of the FCC's Report and Order and Second Further Notice[10] of Proposed Rulemaking in the Matter of Telecommunications Services Inside Wiring, 1997 WL 644031, FCC No. 97-376 (Oct. 17, 1997) ("FCC Second Further Notice"). See CSC Holdings, 235 F. Supp.2d at 248. Paragraph 69 reiterates the explicit reservation contained in the regulations, specifically that the home run wiring provisions "will not apply where the incumbent provider has a contractual, statutory or common law right to maintain its home run wiring on the property." FCC Second Further Notice at *3693 ¶ 69 (Application of Procedural Framework). In addition, the report states that the FCC "adopt[s] specific procedural mechanisms requiring the sale, removal or abandonment of the home run wiring where the MDU owner (1) terminates service for the entire building and wishes to use the home run wiring for an alternative video service provider, or (2) wants to permit more than one multichannel video programming distributor ("MVPD") to compete for the right to use the home run wiring on a unit-by-unit basis." FCC Second Further Notice ¶ 2 at *3661–62. The correct interpretation

---

[10] The FCC Second Further Notice is a report and order issued to address concerns raised in the notice of proposed rulemaking regarding proposed telephone and cable wiring rules. See FCC Second Further Notice ¶ 1.

of this language, according to <u>CSC Holdings</u>, leads to the conclusion that neither the building-by-building or unit-by-unit regulation applies, even against the MDU owner's wishes, as long as the incumbent has a legal right to maintain its home wiring to any subscriber, because the incumbent maintains the right to remain on the premises under either provision.

We disagree with this conclusion. The plain language of 47 C.F.R. § 76.804(a) & (b) demonstrates that under (a), the provisions apply when the cable provider "does not . . . have a legally enforceable right <u>to remain on the premises</u>" (emphasis added) while under (b), the provisions apply when the cable provider "does not . . . have a legally enforceable right <u>to maintain any particular home run wire dedicated to a particular unit</u>," (emphasis added). In our view, the <u>CSC Holdings</u> reading conflates these two provisions. Taken to its logical conclusion, if the MVPD has a right to remain on the premises to serve even one cable subscriber, a building owner may invoke neither provision of the regulations. Under such an interpretation, moreover, the unit-by-unit provision would apply only when the MVPD has lost any right "to remain on the premises." This reading contravenes the specific language of § 76.804(b) and reads the language of § 76.804(a) into § 76.804(b). As noted above, we interpret the language of regulations as we construe the language of statutes; accordingly, we must read the regulations such that every word is operative. See <u>Potter</u>, 343 F.3d

at 626; <u>Finley v. United States</u>, 123 F.3d 1342, 1347 (10th Cir. 1997) (stating that we must construe statutes "in such a manner that every word has some operative effect"). As a result, we reject the <u>CSC Holdings</u> interpretation limiting § 76.804 to only those circumstances where the incumbent provider has been, or will be imminently, ejected from the building.

More convincing, in our view, is the district court's interpretation of the regulations in the instant case.[11] We agree that under the building-by-building regulation, where the incumbent provider retains a right to remain on the premises, the regulation cannot by its terms be invoked. This conclusion is amply supported not only by the plain language of § 76.804(a) (§ 76.804(a)'s provisions apply when the cable provider "does not . . . have a legally enforceable right <u>to remain on the premises</u>" (emphasis added)), but is also supported by the FCC Second Further Notice, which makes clear the distinction between the building-by-building and unit-by-unit context. Specifically, it states "[i]n the building-by-building context, the procedures will not apply where the incumbent provider has a legally enforceable right to maintain its home run wiring on the premises . . ..

---

[11] In <u>Coxcom, Inc. v. Picerne Real Estate Group</u>, 2003 WL 22048781 (R.I. Super. 2003), the Superior Court of Rhode Island, in an unpublished opinion, also rejected the <u>CSC Holdings</u> interpretation of the regulations and concluded that "[a] thorough and complete analysis of the federal regulations reveals that the <u>Time Warner</u> court reached the only conclusion that would be consistent with the purpose of the FCC in enacting the legislation." 2003 WL 22048781 at *11.

In the unit-by-unit context, the procedures will not apply where the incumbent provider has a legally enforceable right to keep a particular home run wire dedicated to a particular unit . . . on the premises." FCC Second Further Notice at *3693 ¶ 69. This distinction is again reiterated in the FCC's discussion of the procedures applicable in mandatory access states. Id. at *3699 ¶ 79.

Thus, it is apparent that the FCC did not intend to divest an incumbent cable operator of its right to service customers in the building by allowing building owners to invoke the building-by-building regulations to eject the incumbent and install another competitor, with exclusive rights to service the entire building, when the incumbent still retained a legal right to service the building. Rather, the building-by-building regulation applies only when the incumbent no longer retains a legal right to service any customer in the building; in that circumstance, the building owner becomes free to negotiate with other cable providers and enter into an agreement allowing a new provider the right to "convert the entire building to a new service provider." FCC Second Further Notice, *3680 ¶ 39.

The unit-by-unit regulation, however, is not intended to be limited only to situations where the incumbent provider no longer has a legal right to service any customer in the building. The FCC's discussion of the Procedures for the Disposition of Home Run Wiring bolsters this conclusion. FCC Second Notice at

*3680–93 ¶ 39–68.  The report explains that the underlying purpose of the procedures regulating the disposition of home run wiring is to "promote competition and consumer choice by bringing order and certainty to the disposition of the MDU home run wiring upon termination of service."  Id. at *3680 ¶ 39.  When discussing the unit-by-unit disposition, the report instructs that the regulation allows an MDU owner to permit head-to-head competition "in the building for the right to use the individual home run wires dedicated to each unit."  Id. at *3685 ¶ 49.  After the MDU owner has informed the incumbent cable service provider of its decision to invoke the unit-by-unit regulations, the incumbent provider must

> make a single election for how it will handle the disposition of the individual home run wires whenever a subscriber wishes to switch video service providers; the election will then be implemented each time an individual subscriber switches service providers.  If the MDU owner permits the alternative service provider to purchase the home run wiring, the alternative service provider will be required to make a similar election . . . for any home run wiring that the alternative provider subsequently owns . . . and that is solely dedicated to a subscriber who switches back from the alternative provider to the incumbent.

Id. at *3685–86 ¶ 49.  Consequently, under the unit-by-unit regulations, once an MDU owner has properly notified an incumbent cable service provider, which does not have a legally enforceable right to maintain its home run wiring to any particular unit on the premises, of its intention to allow head-to-head competition in the provision of cable services in the building, the incumbent cable services

-31-

provider must make a determination of how it will dispose of the home run wiring: remove the wiring, abandon the wiring, or sell the wiring.

Notably, the incumbent provider's election is not effective immediately as to all of the incumbent's home run wiring; rather, the home run wiring will be disposed of, according to the incumbent's election, as the need arises, i.e., as individual tenants elect to terminate cable service with the incumbent and begin service with the alternative cable provider. See § 76.804(b)(3); Second Further Notice at *3688 ¶ 54. Further, the alternative provider must also make an election as to the disposition of any home run wiring it may own; thus, if the incumbent sells to the alternative provider, the alternative provider must decide how it will dispose of the home run wiring it owns should any of its subscribers terminate service and, for example, resume service with the incumbent. See § 76.804(d). Under this scenario, the FCC anticipated that in the unit-by-unit context, individual subscribers would have the opportunity to switch from the incumbent provider to the alternative provider, but that this transition would not be mandatory, nor would the entire building be switched simultaneously. It follows that the unit-by-unit regulation anticipates that the incumbent provider may still be providing services in the building, contemporaneously and in competition with the alternative provider. This differs from the building-by-building provision, which does not contemplate continued cable service from the

incumbent provider, but addresses the complete cessation of service by the incumbent, to be replaced by an alternative service provider.

Explaining further the precise process contemplated in the regulations, the FCC Second Further Notice clarifies the difference between the building-by-building context and the unit-by-unit context. Incumbent providers, under the unit-by-unit option, will not be expected to remove, abandon, or sell all of their home run wiring once the building owner has chosen to allow head-to-head competition. Id. at *3688 ¶ 54. Instead, the report notes that the incumbent, if it has chosen to remove its home run wiring, will have only seven days following notification by the subscriber that the subscriber intends to terminate service in favor of an alternative provider, to remove the subscriber's wiring. This limited time frame, reasoned the FCC, is adequate because "unlike in the building-by-building context, the provider will only be required to remove a single home run wire" when the building owner has invoked the unit-by-unit regulation. Id. at *3688 ¶ 54.

Finally, we note that the FCC refused to require the incumbent service provider to remove its home run wiring, when removal was the option selected by the incumbent, when a subscriber terminated service, but did not indicate it was switching to an alternative service provider. See § 76.804(b)(4). The FCC Second Further Notice explains that "[i]n such cases, we do not believe that it

would be appropriate to require the incumbent to sell, remove, or abandon the home run wiring when it might have every reasonable expectation that the next tenant will request its service." FCC Second Further Notice at *3688 ¶ 56. Again, it is clear that the regulations do not anticipate that the incumbent provider, in the unit-by-unit context, has lost <u>all</u> rights to provide cable service to tenants in the building. Rather, the regulations accommodate both the incumbent provider and any alternative provider who enters subsequent to the building owner's invocation of the unit-by-unit regulation. Therefore, we conclude, based on the foregoing, that the unit-by-unit regulation is appropriately invoked by the building owner in order to allow head-to-head competition from an alternative video services provider when the incumbent cable services provider no longer has the legally enforceable right to maintain the wires servicing a particular unit.

## III

Applying this interpretation of the license agreement and the federal regulations to the case at hand, we conclude that under the license agreement between The Atriums and Time Warner, The Atriums may invoke the procedures outlined in 47 C.F.R. § 76.804(b) as to the home run wiring dedicated to units not subscribing to Time Warner's services. Accordingly, the decision of the district court is **AFFIRMED**.

No. 03-3005 - <u>Time Warner v. Atrium Partners</u>

**HARTZ**, Circuit Judge, dissenting:


I respectfully dissent. I agree with the majority opinion's analysis and discussion of the FCC's home run wiring rules. But I disagree with the application of the rules to this case because I read the licensing agreement differently than the majority does.

The majority opinion states that Time Warner (for simplicity I shall refer to both TeleCable and Time Warner as Time Warner) has a license to maintain home run wires to each apartment in The Atriums but that this license is conditional—it exists only so long as the tenant subscribes to Time Warner's cable service. Before explaining why I think that this is not a proper construction of the terms of the license agreement, I should note that it would be rather surprising if the parties had in fact imposed the condition that the majority opinion reads into the agreement. Without a license, Time Warner would be a trespasser, and hence could be required to remove its home run wires at the whim of The Atriums. The Atriums, however, would have had no legitimate reason to require Time Warner to remove the wires whenever an individual tenant canceled service. To be sure, under the new FCC regulations The Atriums might have a good reason to restrict Time Warner's license—the restriction would enable The Atriums to require Time Warner to compete with other cable providers for the patronage of the tenants.

But no one suggests that the new regulations were foreseeable when the license agreement was executed.

In my view, the majority opinion errs in (1) reading too much into the preamble of the agreement, (2) failing to consider the clear operative language of the agreement, (3) overlooking the parties' initial construction of the agreement, and (4) misconceiving the "access" provision of the agreement, which merely sets forth the time during which Time Warner can enter The Atriums in connection with its license.

## 1.    The Preamble

Rather than relying on the operative terms of the agreement—the numbered paragraphs following the words "NOW, THEREFORE, the parties hereto agree as follows"—the majority opinion relies on language in the preamble.  It focuses on the language in Paragraph C of the preamble stating that "[Time Warner] desires to install, operate and maintain its . . . facilities . . . in the Project . . . <u>in order to serve those tenants . . . who shall from time to time pay [Time Warner] for its services</u>." (emphasis added).  According to the majority opinion, the emphasized language shows that the license for maintaining the home run wire to an apartment is limited to those periods during which the apartment's tenant is a paid subscriber to Time Warner's services.

I cannot agree.  Although the purpose of the agreement undoubtedly is to

provide cable service to the tenants while they are paid subscribers, that purpose does not fully determine the scope of the license. Perhaps that purpose could be adequately served by terminating the license to maintain the home run wire whenever the tenant cancels service. But that purpose could also be properly served by permitting continuation of the license to maintain those wires even when the tenant cancels. Continuation of the license despite cancellation would free Time Warner from the risk that The Atriums would whimsically demand removal of the wires; Time Warner could then be sure that it could promptly resume service (without the need to reinstall the home run wire) if a new tenant desired cable television. When the agreement was executed, continuation of the license would have served the convenience of Time Warner and tenants while causing no inconvenience or harm to The Atriums.

One must therefore look to the operative provisions of the agreement to determine the scope of the license. Indeed, the preamble to a contract does not define the rights and duties of the parties; it serves only as an aid in interpretation. See Grynberg v. FERC, 71 F.3d 413, 416 (D.C. Cir. 1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond that arising from the operative terms of the document." (internal quotation marks omitted)). A leading treatise on contract law approves the statement that "'[t]he generally accepted interpretive

-3-

rule is that a general, preliminary clause should not ordinarily take precedence over specific provisions of a contract.'" 11 Williston on Contracts § 32:15 (4th ed.) (quoting Parkhurst v. Gibson, 573 A.2d 454, 458 (NH 1990)); see Rose v. M/V "Gulf Stream Falcon," 186 F.3d 1345, 1350 (11th Cir. 1999) ("under Florida law . . . 'whereas' or other prefatory clauses are not binding").

## 2.     Operative Language

The relevant operative provision of the license agreement is the first sentence of Paragraph 1:

> Subject to the terms and conditions hereinafter set out, [The Atriums] hereby grants to [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as [Time Warner] deems necessary or desirable in or on [The Atriums'] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project.

(emphasis added). (Although the majority opinion quotes Paragraph 1 when it sets forth most of the agreement, it never addresses this language.) There can be no dispute that Time Warner deems it desirable to keep its home run wire on the premises even after a tenant cancels service. Leaving the wire in place enables Time Warner to provide service to an apartment more readily if the tenant (or a new tenant) decides to resume service.

One could argue that when the agreement was executed Time Warner did not need a license that would prevent The Atriums from ordering removal of the home run wire whenever a tenant discontinued service. Such protection at that

-4-

time would have seemed unnecessary because The Atriums would surely not have made the purposeless, destructive demand that Time Warner remove the wire. But that argument demonstrates why The Atriums would not have resisted an unconditional license—one that continues even when a tenant terminates service. Accordingly, I would read the agreement to grant a license to maintain the home run wire to an apartment regardless of whether the tenant is a current paid subscriber. In my view, this construction of the agreement is compelled even if the agreement is read strictly against the interests of Time Warner.

To say that the license is "unconditional" is not to say that the "in order to provide [cable] services" clause of Paragraph 1 is meaningless. It has at least two important functions. First, when Time Warner can no longer provide cable service—for example, it might lose its franchise—the license is useless and becomes void, so Time Warner could not reasonably "deem[] [it] necessary or desirable" to maintain home run wires. Second, and more importantly, the license is limited to cable service. Time Warner would not be permitted to use the license for, say, telephone service.

3.   **Initial Construction of Agreement**

There is an additional compelling reason not to construe Paragraph 1 as limiting the home-run-wire license to the period when the tenant subscribes to Time Warner service. Such a construction of Paragraph 1 would be contrary to

the conduct of the parties at the outset of the agreement's operation. The home run wiring was installed before there were tenants. Yet the phrase "in order to provide CATV and Pay TV services to tenants in the Project" applies not only to maintenance of the home run wires but also to their initial installation. To quote again the first sentence of Paragraph 1:

> Subject to the terms and conditions hereinafter set out, [The Atriums] hereby grants to [Time Warner] the right, license and permission <u>to install</u>, operate and maintain such of the <u>facilities</u> as [Time Warner] deems necessary or desirable in or on [The Atriums'] property and in the Project <u>in order to provide CATV and Pay TV services to tenants in the Project</u>.

(emphasis added). If the "in order to provide" language limits the privilege granted to Time Warner to the period when it is serving a current subscriber, then home run wiring to an apartment could not have been <u>installed</u> until the apartment's tenant became a subscriber. Moreover, it would be remarkable for The Atriums to permit Time Warner to install home run wire to an unoccupied apartment but then deny a license to keep the installed wire in place if the first tenant decided not to subscribe. The parties' construction of the agreement so close to the time of the agreement's execution is strongly probative of the parties' understanding of the agreement at the time of execution. <u>See</u> <u>Heyen v. Hartnett</u>, 679 P.2d 1152, 1157 (Kan. 1984).

4.      **"Access" Provision**

I fail to understand the majority opinion's reliance on the "access"

-6-

provision in the agreement, the second sentence of Paragraph 1: "[Time Warner] shall have the right to enter the Project at any time to perform maintenance on and make repairs and replacements of the facilities, or any part thereof, and to install or disconnect customers." Focusing on the words giving Time Warner "the right to enter the Project at any time . . . to install or disconnect customers," the majority opinion contends that this provision would be unnecessary if Time Warner "had a right to enter The Atriums at any time to maintain unused wires." Op. at 18.

This argument misconceives the access provision. The provision merely clarifies Time Warner's right of entry onto The Atriums' premises to perform work in connection with its license. It is one thing to grant a license to install and maintain wiring, and quite another to set the times when the licensee can enter the premises in connection with the license. The access provision addresses only the latter issue. Without the access provision one might interpret the agreement to allow access onto the premises only at "reasonable" times—such as during regular business hours. Indeed, the following sentence of Paragraph 1 restricts the time during which Time Warner can market its services on the premises: " [Time Warner] shall have the right between the hours of 9:00 AM and 5:00 PM to enter the Project to solicit new customers."

-7-